The REGENTS OF the UNIVERSITY OF CALIFORNIA, The University of Southern California, The Pacific-10 Conference, and The Big Ten Conference, Plaintiffs-Appellees,

v.

AMERICAN BROADCASTING COMPANIES, INC., ABC Sports, Inc., Entertainment and Sports Programming Network, Inc., The College Football Association, The Board of Regents of the University of Nebraska, and The University of Notre Dame Du Lac, Defendants-Appellants.

Nos. 84–6310, 84–6322.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1984.

Decided Nov. 9, 1984.

---

John N. Hauser, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Byron L. Gregory, McDermott, Will & Emery, Chicago, Ill., for plaintiffs-appellees.

James Loftis, Washington, D.C., for defendants-appellants.

Before ANDERSON, FERGUSON and BEEZER, Circuit Judges.

FERGUSON, Circuit Judge:

On June 27, 1984, the Supreme Court held that the National Collegiate Athletic Association's (NCAA's) position as the exclusive bargaining agent for college football television rights violated section one of the Sherman Act. *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma (Regents)*, —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Immediately thereafter, most universities with football programs began to renegotiate television contracts. Similarly, the television networks, particularly the American Broadcasting Company (ABC) and the Columbia Broadcasting System (CBS), eagerly sought to acquire the broadcasting rights previously disbursed by the NCAA. Less than a month after the Supreme Court's *NCAA* decision, a large number of college conferences and independent football powers entered into an exclu-

sive broadcasting contract with ABC under the new banner of the College Football Association (CFA). A much smaller, but nonetheless formidable group of schools, the twenty members of the Pacific-10 and Big Ten Conference, signed with CBS for the 1984 football season. Shortly thereafter this smaller group of colleges, including the Regents of the University of California, the University of Southern California, the Pacific-10 Conference, and the Big Ten Conference, filed this antitrust suit against the defendants ABC, the CFA, and two CFA member institutions. The plaintiffs, mainly pressing their antitrust claims, sought and obtained a narrow preliminary injunction prohibiting Nebraska and Notre Dame from refusing to consent to the broadcast of one of their fall games solely on the basis of the exclusivity terms of their contract with the remaining defendants. By its terms, the preliminary injunction does not require the individual defendant schools to consent to the plaintiffs' broadcast offers. Instead, it merely bars the two universities from withholding consent solely on the terms of the contract between the CFA and ABC. After the district court denied the defendants' application for a stay of the preliminary injunction, which would have had the practical effect of barring live television coverage of the Nebraska-UCLA and Notre Dame-USC games, the defendants appealed. We affirm.

## I. FACTS

The history of the college football television market is chronicled in the Supreme Court's *NCAA* decision, — U.S. ——, 104 S.Ct. 2948, 2954–57, 82 L.Ed.2d 70 (1984), and need not be repeated here. Under both long and short term contracts, the defendant ABC and its sports broadcasting subsidiaries were the principal beneficiaries of the NCAA's former control over college football broadcast rights. In the wake of the Supreme Court's NCAA decision, ABC

can lay claim to the broadcasting rights for the 63 major college football programs which make up the CFA.[1] An integral part of ABC's broadcasting contract with the CFA requires member schools to maintain, on pain of CFA sanctions, ABC's position as the exclusive network for member television coverage. The broadcast restraints posited by the ABC contract come in several forms. The particular restraint which triggered the preliminary injunction and precipitated this appeal is called the "crossover restriction." In essence, the crossover restriction contained in the ABC–CFA contract bars the broadcast of CFA member games on other networks even when the opposing team is not a member of the CFA.

By design, the ABC television contract with the CFA attempts to create an exclusive "network window" from 3:30 to 11:30 P.M. EST on Saturdays wherein two CFA games of ABC's selection will be broadcast. These two games, chosen by ABC or its subsidiary the Entertainment and Sports Programming Network, Inc. (ESPN), are the only two games between CFA members eligible for broadcast during this time period. The ABC contract further provides that this exclusive Saturday afternoon window also extends to games played between CFA members and other colleges not affiliated with the CFA. Hence, the ABC contract prohibits the broadcast of games between CFA and non-CFA teams, called crossover games, during this Saturday time frame through the enforcement of its exclusive broadcasting rights with the CFA. Stated differently, the ABC–CFA contract not only curtails broadcasting competition among member CFA schools, but also seeks to eliminate direct network competition by prohibiting the telecast of crossover games.

■ The Big Ten and Pac–10 Conferences (hereafter referred to as the Pac-10-

---

**1.** Even to those uninitiated in the seasonal nuances of the college football game, the broad geographic span of the CFA member institutions, including schools such as Nebraska, Notre Dame, Boston College, Miami of Florida, Okla-homa, Texas, SMU, Alabama, Missouri, Brigham Young and Pittsburgh, reveals the imposing position the CFA occupies within the college football broadcast market.

Big Ten Conference) declined the opportunity to join the CFA. These two Conferences, with their twenty member schools, struck out on their own and negotiated a contract with CBS on July 18, 1984, several days before ABC entered into the agreement with the CFA. This fact is relevant to our inquiry because the function of a preliminary injunction is to preserve the status quo *ante litem*. *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir.1963). Discerning the status quo *ante litem* presents little problem in this case because the challenged conduct, the exclusivity provisions of the ABC–CFA contract, came into existence after the plaintiffs had contracted for their broadcasting package with CBS. There has been no counterclaim by the defendants regarding the plaintiffs' contract. Hence, the only matter in controversy is the terms of the ABC–CFA contract. Without question, " 'the last, uncontested status which preceded the pending controversy,' " *id.* at 809 (quoting *Westinghouse Electric Corp. v. Free Sewing Machine Co.*, 256 F.2d 806, 808 (7th Cir.1958)), is preserved by the preliminary injunction.

The terms of the Pac-10 and Big Ten contract gave CBS similar rights to broadcast Saturday games, selected by CBS, between Pac-10-Big Ten Conference teams. The contract also claimed rights to the crossover games between Pac-10 and Big Ten Conference members and non-Conference teams.[2] Not surprisingly, given the rich tradition and perennial prominence of both Conference and CFA teams, two crossover confrontations, a Nebraska-UCLA game and a Notre Dame-USC match, had been previously scheduled for the 1984 season.

The Pac-10-Big Ten Conference desires to broadcast both of these games, only one

of which remains at issue,[3] and ABC has attempted to prevent CBS coverage through the enforcement of the CFA crossover restrictions. Based on the complaint and the substantial record placed before it, the district court issued a preliminary injunction prohibiting two CFA members, Notre Dame and Nebraska, from withholding consent to the CBS broadcast of their games against the two PAC-10 teams, USC and UCLA, based solely on the terms of the ABC–CFA crossover restriction. The district court further enjoined the CFA and its members from imposing or threatening to impose any sanctions on either Nebraska or Notre Dame to inhibit these schools from voluntarily consenting to a CBS crossover broadcast. Consequently, at this very early stage in the antitrust litigation, the net effect of the trial court's preliminary injunction is limited to the telecast of the game between Notre Dame and USC on November 24, 1984. Moreover, while the preliminary injunction does insure that ABC and the CFA cannot unilaterally prevent the CBS broadcast of this game, the injunction does not compel Notre Dame to consent to the CBS broadcast of its Thanksgiving weekend game against USC. Instead, the preliminary injunction operates to liberate Notre Dame from the constraints of the crossover restriction while simultaneously permitting the school to make a truly independent decision on whether to accept CBS's Thanksgiving weekend broadcast package.

The premise behind the district court's preliminary injunction, and indeed the principal contention raised in plaintiffs' complaint, is that the ABC–CFA contract violates this nation's antitrust laws. Specifically, the plaintiffs allege that the defendants have violated section 1 of the Sherman

---

**2.** The legality of the Conference's crossover restriction is not at issue in this litigation in the absence of a cross-claim by the defendant. Accordingly, a comparison of the two is unnecessary.

**3.** The preliminary injunction was issued on September 10, 1984 and had its initial impact on the first scheduled crossover game between Ne-

braska and UCLA which took place on September 22, 1984. Faced with the terms of the preliminary injunction the University of Nebraska elected to give its consent to televising this game nationally on CBS rather than forgo any telecast. By not televising any college game during the Nebraska-UCLA telecast, ABC chose not to compete during this crossover match.

Act which prohibits "[e]very contract, combination ... or conspiracy in restraint of trade...." 15 U.S.C. § 1. The plaintiffs have challenged the exclusivity of the ABC–CFA television contract as to competition among CFA member institutions as well as that between CFA and non-CFA colleges. Although the district court did not reach any final conclusions on the merits of the plaintiffs' case, by necessity the court made some findings on the strength of the plaintiffs' antitrust claims. The only ultimate conclusion reached by the court was to preserve the status quo pending the resolution of the merits of plaintiffs' complaint. Our task, under the appropriate standard, is to review this limited and narrow exercise of the district court's equitable discretion.

## II. STANDARD OF REVIEW

■ The standard of review for the issuance of a preliminary injunction has often been stated and needs no lengthy elaboration here. A trial court's decision in granting or denying a preliminary injunction will only be set aside when it is based on an abuse of discretion or on improper legal premises. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980). This court must evaluate whether the trial court correctly identified and applied the pertinent legal standards in passing on the motion for a preliminary injunction. This circuit has formulated different descriptions, some simple and some ornate, of the correct legal standard for the issuance of a preliminary injunction. *See, e.g., id.* (setting forth a four part test requiring strong likelihood of success on the merits, possibility of irreparable injury to plaintiff absent injunction, balance of hardships favoring plaintiff, and advancement of public inter-

est); *American Motorcyclist Ass'n. v. Watt,* 714 F.2d 962, 965 (9th Cir.1983) (articulating a three part standard for issuance of a preliminary injunction); *Benda v. Grand Lodge of IAM,* 584 F.2d 308, 314–15 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979) (approving use of an abbreviated two part test). Long or short, old or new, these tests "are not separate tests but the outer reaches 'of a single continuum'." *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d at 1200 (quoting *Benda v. Grand Lodge of IAM,* 584 F.2d at 315).

■ None of the respective factual inquiries described by the various standards are irrelevant to the district court's essential task of balancing the equities in the exercise of the equitable discretion vested in the district court. In this case the district court utilized the middle standard in the "continuum," which has been described as the "traditional" standard in this circuit. *See American Motorcyclist Ass'n. v. Watt,* 714 F.2d at 965. Under this traditional test a preliminary injunction is justified when: (1) the moving party has established a strong likelihood of success on the merits; (2) the balance of irreparable harm favors the moving party; and (3) the public interest favors the issuance of an injunction. *American Motorcyclist Ass'n. v. Watt,* 714 F.2d at 965. In this case the district court expressly found that the public interest is served by the issuance of the preliminary injunction; that the balance of the hardships sharply favors the plaintiffs and, in fact, the defendants would suffer no appreciable hardship and the university defendants would even benefit from the injunction; and, finally, that the plaintiffs had raised serious questions[4] whether the de-

---

4. Admittedly, the reference to the "serious questions" presented as to the defendant's compliance with section one of the Sherman Act suggests that the district court may have utilized the short, two-part, "alternative" standard set forth in *Benda v. Grand Lodge of IAM,* 584 F.2d at 315, which requires a lesser showing of only a balance of hardships tipped sharply in the

plaintiff's favor coupled with a "fair chance of success on the merits" or presenting questions "serious enough to require litigation." Nonetheless, the district court did expressly find that the public interest favored the issuance of the preliminary injunction, a finding consonant with the plenary inquiry outlined by the traditional

fendants had violated the antitrust laws. We review the district court's findings to determine whether the court abused its discretion in reaching its conclusions.

A. Likelihood of Success on the Merits

■ In their complaint, the plaintiffs allege that the actions of the defendants violate section one of the Sherman Act in two different respects. First, plaintiffs characterize the CFA crossover restriction as refusal to deal by CFA members with non-CFA members on television broadcast coverage. In the alternative, the plaintiffs also assert that the defendants have formed a cartel restricting the output of televised games so as to raise artificially the value of the ABC–CFA contract. So cast, the plaintiffs' complaint alleges the classic antitrust violations of "group boycott" and "price-fixing." These two different types of commercial activity have traditionally been categorized as *per se* violations of the antitrust laws. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (agreement not to sell to individual retailer constituted group boycott subject to *per se* rule); *Associated Press v. United States*, 326 U.S. 1, 12–15, 65 S.Ct. 1416, 1420–1422, 89 L.Ed. 2013 (1945) (joint newspaper venture cannot expressly prohibit all transactions with non-members); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (major oil refiners' concerted program to purchase distressed gasoline to prop up market price constitutes price-fixing subject to *per se* analysis).

■ Some forms of concerted action, however, cannot be and are not so easily categorized as patently anti-competitive. Courts review such activity, ambiguous on its face, under the so-called Rule of Reason to determine whether its purpose and effect is to derail free competition. Plaintiffs further contend that even if the defendants' conduct is subject to this more searching rule of reason inquiry, the trial court correctly concluded that the plaintiffs are

test. Hence, we review the district court's find-

nonetheless likely to succeed on their antitrust claims. Conversely, the defendants object to the categorization of their conduct as *per se* violations and further aver that their actions will withstand review under the Rule of Reason.

■ We need not reach the issue of whether *per se* or Rule of Reason analysis will govern the evaluation of the plaintiffs' antitrust claims. Under either analysis the trial court did not abuse its discretion in finding that the plaintiffs had presented serious questions indicating a fair chance of success on the merits. Indeed, our confidence in the district court's finding on this matter cannot ask for a more firm footing than that found in the Supreme Court's recent decision in *NCAA v. Regents*, — U.S. —, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Fortunately, the *NCAA* decision not only precipitated the present state of affairs in the college football television market, it also provided the concomitant legal insights necessary to facilitate our inquiry in this case.

In *NCAA v. Regents*, the Supreme Court held that the NCAA's exclusive control over the football broadcast rights of member institutions violated section one of the Sherman Act. In reaching this conclusion the Court applied the "Rule of Reason," *id.* 104 S.Ct. at 2962, and found that the plan constituted an impermissible restraint on the market. *Id.* 104 S.Ct. at 2967. The Court further held that the NCAA had not established any affirmative defense sufficient to justify the perpetuation of the trade restraints under the Rule of Reason. Reference to the reasoning behind the Court's twin conclusions on the applicability of the Rule of Reason and the absence of any affirmative defense is instructive in evaluating the seriousness of plaintiffs' allegations in the present case.

In *NCAA v. Regents*, the Supreme Court rejected a *per se* approach to the analysis of the NCAA's clear domination of the college football broadcasting market. 104 S.Ct. at 2961–66. In so doing, the Court

ings under the traditional standard.

recognized that the NCAA television plan constituted a horizontal restraint on trade of a character similar to prior restraints that had succumbed to the *per se* rule. *Id.* 104 S.Ct. at 2960. Nonetheless, the Court dismissed the *per se* rule in favor of the Rule of Reason for one express reason: the very nature of the industry rendered "horizontal restraints on competition ... essential if the product is to be available at all." *Id.* 104 S.Ct. at 2961. In the Court's view, the college football industry must collectively adopt and enforce uniform rules; the integrity of the industry must be preserved through mutual agreement and enforceable standards; and, the quality of the common industrial "product" is inexorably linked to the vitality of the industry itself. The NCAA performed all of these essential functions. Presumably, the Court's acceptance of this essential entity argument, focusing as it does on the needs of an entire industry, would have equal force in both group boycott and price-fixing settings. Having found that the NCAA performed all of these essential roles in furthering and policing the college football industry, the Supreme Court held that the attendant horizontal restraints should be examined under the Rule of Reason rather than the *per se* rule.

Obviously, the Court's categorization of the NCAA's vital relationship to the college football "industry" is not equally transferable to the CFA. By any account, the purpose and effect of the horizontal restraints imposed by the CFA and the ABC–CFA contract have little, if any, bearing on the operative rules of collegiate football. Presumably, the essential ingredients of industry uniformity and product integrity are still being furnished by the same entity—the NCAA. More to the point, if an industry depends on such an entity for its very sinews, logic suggests that there can be only one such entity per industry. With the NCAA having already occupied the field of "college football," the CFA and the ABC–CFA contract appear to constitute classic horizontal restraints unadorned by any organic relationship to the "character and quality of the 'product'." *Id. Cf.*

*NCAA,* 104 S.Ct. at 2969 (NCAA's "restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.").

Accordingly, the reasoning of the *NCAA* decision suggests that traditional antitrust analysis, and the attendant *per se* label, should apply to the plaintiffs' boycott and price-fixing allegations. Although we need not decide here whether the *per se* label shall attach to the antitrust inquiry in this case, we note that price-fixing and group boycotts have traditionally been subject to *per se* review. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (group boycott subject to *per se* rule); *United States v. Columbia Pictures Industries, Inc.,* 507 F.Supp. 412, 426–28 (S.D.N.Y.1980) (same); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal restraints dividing market among joint venturers subject to *per se* rule); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (joint program to purchase spot oil so as to influence market price subject to *per se* rule as price-fixing). The features of the ABC–CFA contract will no doubt have the effect of limiting the output of televised college football. The exclusionary nature of the crossover restriction appears on its face to be in furtherance of a concerted refusal to deal. *See E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 187 (5th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). On the record before the trial court, therefore, we cannot say that it abused its discretion in finding that the plaintiffs had presented serious questions regarding the defendants' compliance with section one of the Sherman Act.

Conversely, application of the Rule of Reason does not diminish the thrust or

force of the plaintiffs' case. Once again, the Supreme Court's *NCAA* decision illustrates the strength of the plaintiffs' case. The defendants contend that the CFA and the ABC–CFA contract are actually pro-competitive. Citing *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the defendants characterize their relationship as a joint selling arrangement creating a "new and different product, an ABC 'CFA Football' program." In *Broadcast Music,* the Supreme Court upheld a joint selling arrangement among music composers which had the effect of increasing the total volume of musical compositions sold in the market. *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). The Supreme Court, however, has already rejected a similar attempt to rely on the *Broadcast Music* opinion as a justification for the NCAA's restraints on individual college broadcasting competition. *NCAA v. Regents*, 104 S.Ct. at 2967–68. As the Supreme Court in *NCAA* noted, the possibility of individual competition, with the concomitant increase in output, was considered the saving grace of the joint selling arrangement in the *Broadcast Music* case. *NCAA*, 104 S.Ct. at 2968. The ABC–CFA "arrangement," just as the NCAA television plan that fell before it, shares the dual infirmities of an intentional reduction in output along with the imposition of sharp restraints on individual school competition. Moreover, this conclusion applies with as much force to the ABC–CFA contract considered as a whole as it does to the component restraints found in the cross-over restriction.

██ Reversing their field, the defendants have also suggested that the CFA is not a mutual arrangement for the imposition of essential horizontal restraints but rather the CFA simply imposes non-price vertical restrictions on the ultimate distrib-

utors of its product. Once again, the defendants' arguments fail as a result of the Supreme Court's *NCAA* opinion. Substance, not form, will determine whether the CFA is a single economic entity engaged in distributing a product to its distributors. *See United States v. Sealy,* 388 U.S. 350, 352, 87 S.Ct. 1847, 1849, 18 L.Ed.2d 1238 (1967). The Supreme Court, in the *NCAA* decision, despite its recognition of the many substantive and valuable functions the NCAA performs to advance the industry, found the NCAA television plan to be "a horizontal restraint—an agreement among competitors on the way in which they will compete with one another." *NCAA,* 104 S.Ct. at 2959. *Cf. Los Angeles Memorial Coliseum v. National Football League,* 726 F.2d 1381, 1389 (9th Cir.1984). It is unclear how the CFA, which does not even purport to perform the supervisory functions undertaken by the NCAA, occupies a different posture with respect to its member institutions. Even if the defendants' characterization of the CFA arrangement as a nonprice vertical restraint could successfully be argued after the NCAA decision,[5] this circuit has adopted a market share analysis of vertical restraints which, under the concentrated conditions of the college football television market and the CFA's position therein, significantly diminishes the defendants' chances under the Rule of Reason. *See Continental T.V., Inc. v. G.T.E. Sylvania Inc.,* 694 F.2d 1132, 1138–39 (9th Cir.1982) (adopting Fifth Circuit's use of market-structure analysis in *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1005–06 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981)).

██ The defendants' final argument in the way of an affirmative defense is that the plaintiffs' antitrust suit is barred by the doctrines of *in pari delicto* or unclean

---

5. In finding the NCAA television plan a "horizontal" restraint, 104 S.Ct. at 2959, the Supreme Court apparently reversed the Tenth Circuit's prior determination that the NCAA stood in a vertical relation to the networks. *See Board of Regents v. NCAA,* 707 F.2d 1147, 1161 (10th

Cir.1983), *aff'd on other grounds,* —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). We need not decide the effect of this inconsistency on this case at this juncture but we can readily infer which characterization will have the greater weight.

hands. This contention need not detain us for long. Although the Supreme Court has broadly stated that the *in pari delicto* defense has no role in the antitrust field, *Perma Life Mufflers Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Court left the decision open as to whether a plaintiff's "complete involvement" in an antitrust violation could ever be a basis for barring suit under the antitrust laws. *Id.* at 140, 88 S.Ct. at 1985. This circuit has "determined that 'complete involvement' does constitute a defense to a treble damages claim in an antitrust action." *THI-Hawaii v. First Commerce Fin. Corp.*, 627 F.2d 991, 995 (9th Cir.1980). Nonetheless, the defense contemplates that the plaintiff at least be a participant, if not an equally culpable participant, *see Berner v. Lazzaro*, 730 F.2d 1319, 1324 (9th Cir.1984), in the alleged violation of the antitrust laws. *See THI-Hawaii v. First Commerce Fin. Corp.*, 627 F.2d at 995. The only alleged violation currently before the court is that of the ABC–CFA "arrangement." The defendants have not even alleged, much less proven, complicity on the part of the plaintiffs in this alleged violation.

In conclusion, we cannot say that the trial court abused its discretion in finding that the plaintiffs have raised serious questions about the legality of the defendants' conduct under section one of the antitrust laws. We need only look to the reasoning of the Supreme Court in the *NCAA* case to confirm the trial court's preliminary conclusions on the plaintiffs' likelihood of success in the prosecution of their antitrust claims.

### B. Balance of Hardships

The trial court found that the "balance of hardships tilts rather sharply in favor of the plaintiffs." Referring to the "intangible" benefits of nationwide television coverage that the parties had discussed at length, the court held that the hardships imposed by declining to issue the injunction far outweighed the hardship that a narrow preliminary injunction would present to the defendants. Again, our role is not to determine what we would do if first presented with the issue. Rather, we must ascertain whether the trial court abused its discretion in finding that the center of gravity for the hardships in this case fell squarely on the side of the plaintiffs. Moreover, we review the trial court's decision based on the record as it then existed, and not on subsequent developments. Finally, we examine the balance of the hardships to the parties, not the scope of injunction, to determine where the equities lie. Of course, if the scope of the injunction is unclear or overbroad, a situation not alleged or present in this case, we may find an abuse of discretion on that basis.

At oral argument before the district court the plaintiffs demonstrated that they would suffer irreparable injury if the ABC–CFA crossover restriction was enforced. The plaintiffs described, along with supporting evidence, the numerous ways in which they would be injured from the enforcement of the allegedly illegal crossover restriction. The trial court was persuaded and found that the plaintiffs would be "clearly harmed" in the absence of a preliminary injunction "both monetarily and with respect to the intangibles discussed at length in argument on the motion." Now, of course, a party is not entitled to a preliminary injunction unless he or she can demonstrate more than simply damages of a pecuniary nature. *Los Angeles Memorial Coliseum Comm'n. v. National Football League*, 634 F.2d 1197, 1202 (9th Cir.1980). This is nothing more than a corollary to the principle that the exercise of equitable jurisdiction is predicated on the absence of an adequate remedy at law. We do not think, however, a trial court's recognition of the obvious— i.e., that monetary losses can indeed attend the infliction of intangible injuries—requires that this court ignore an otherwise unambiguous finding of intangible injury. Instead, we must look to the record, mindful of the celerity of the proceedings, to determine whether the trial court abused its discretion in finding irreparable injury strongly favoring the plaintiffs' case.

The plaintiffs described several ways in which they would suffer injury beyond the mere loss of income from broadcasting. These injuries include: the impairment of their ongoing recruitment programs; the dissipation of alumni and community good-will and support garnered over the years; placement of plaintiffs' teams at a significant disadvantage for purposes of national ranking [6]; the deprivation of the opportunity to showcase rivalries of unique tradition and moment in the "industry"; and a reduction in the attractiveness of the Pac-10-Big Ten Conference "product" which would doom the Pac-10-Big Ten's efforts to compete in the market. These disparate injuries are obviously interrelated, and, if there is one common thread it lies in the conclusion that the plaintiffs would suffer some palpable diminution in national reputation and following from their inability to telecast their premier contests. We also recognize that although these hardships are shared by all of the plaintiffs, they affect the Pac-10-Big Ten Conference plaintiffs in a manner somewhat distinct from the individual plaintiff institutions.

With the possible exception of the competitive injury to the Pac-10-Big Ten program, we cannot find that the district court abused its discretion in depicting these hardships as sufficient to support the issuance of the very narrow preliminary injunction. One doesn't have to be a football coach to realize that the successful recruitment of student athletes depends on a combination of athletic prowess, national and conference ranking and esteem, the frequency of post-season bowl appearances, a program's incidence of individual athletic awards such as the prestigious Heisman trophy, and the successful placement of student athletes in the ranks of professional sports. Given the amateur status of collegiate football, a successful recruitment

program is the principal means of improving or maintaining the competitive "quality" of the "product." To be sure, successful coaching plays a critical role in furthering the competitive stature of a college team. Coaches, especially successful ones, are not themselves immune from the recruitment efforts of college football programs. The parties do not dispute that the nationwide exposure that television provides college football games directly affects the ability of a college program to attract and retain student athletes. Nationwide television coverage expands the horizons of a college recruitment program and telegraphs to potential athletes the skill, enthusiasm, and esprit that differentiates one program from the next. Coaching skills, student body support, and athletic ability are all on display to students, parents, and alumni during these weekly fall contests. Especially in light of the NCAA's role in regulating and policing uniform recruitment practices, a function left undisturbed by the *NCAA* opinion, television exposure offers a unique opportunity for colleges in their battle to win the enrollment of prospective student athletes. We fail to discern an abuse of discretion by the trial court in refusing to say categorically that the injuries non-exposure would inflict are insubstantial, fleeting, or fully compensable in monetary terms.

The record fails to reveal any significant injury to the defendants stemming from the issuance of the preliminary injunction. The terms of the preliminary injunction will have no effect on the individual college defendants other than removing the fetters of the ABC–CFA contract from their game broadcast bargaining negotiations. National exposure by either network would advance the goals of their college football programs. The defendant ABC argues

---

**6.** While at first blush this concern may appear remote, the importance of the national rankings, from the perspective of both the colleges and the networks, cannot be ignored. In fact, the parties to both the ABC–CFA and the CBS-Conference contracts have taken great pains to insure that the televised college games are followed by promotional segments emphasizing the respective rank of the various teams and promoting the conference and inter-conference rivalries. Obviously, if the parties devote so much attention to identifying the graphic detail to which national rankings will be promoted, we would be hard pressed to dismiss national rankings, and the networks' role in fostering them, as trivial.

that its efforts for "product identification" of CFA football as a distinct "brand" will suffer if it cannot enforce its crossover restriction. In other words, permitting the broadcast, over ABC's protest, of a CFA-non-CFA contest, would somehow diminish ABC's program to differentiate "CFA football" from all other varieties of college football. If the preliminary injunction somehow interfered with ABC's ability to select particular games for ABC broadcast the network may have a stronger hardship argument. Instead, the only identifiable injury to ABC is to its ability to prevent the broadcast of one game in which both teams have not previously agreed to an ABC broadcast. We readily concur with the district judge's finding that this hardship merits little, if any, weight. From the individual college's perspective, on the other hand, the "quality" of the college football program is affected by national exposure regardless of which network performs the task. The preliminary injunction simply frees the individual institutions to assess the needs of their programs from their own perspective.

## C. The Public Interest

The district court found that the public interest also favored the issuance of the preliminary injunction. In *NCAA v. Regents,* —— U.S. ——, 104 S.Ct. 2948, 2964, 82 L.Ed.2d 70 (1984), the Supreme Court also took stock of where the public interest lay in evaluating the NCAA's horizontal restraints on the college football television market. In particular, the Supreme Court found that "perhaps the most significant" point in favor of striking the NCAA's horizontal restraints is the "importance of consumer preference in setting the price and output" of the televised college football games. *Id.* Viewing the Sherman Act as a " 'consumer welfare prescription' " *id.* (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979)), the Court invalidated the NCAA's horizontal restraints because they removed the consumer from the economic picture in determining the supply and demand of televised college football

games. From the Supreme Court's perspective, then, the public interest is served by preserving the competitive influence of consumer preference in the college broadcast market. Obviously, the district court's issuance of the preliminary injunction in this case accomplishes precisely this salutary objective. Absent the injunction the defendants could unilaterally determine that the public would not have the choice of viewing an admittedly popular college football game. Although the preliminary injunction does not guarantee that the November 22nd game will be televised, the injunction does preserve the efficacy of consumer preference in that the participants in the game are free to take account of consumer interest when evaluating the merits or terms of a nationwide broadcast of the game. Without the preliminary injunction, the consumer has no influence on the broadcast decision and the ABC–CFA crossover restriction will prevent a nationwide broadcast based on competitive considerations unrelated to consumer demand for the particular game.

Guided by the Supreme Court's recent articulation of the "public interest" in the college football television market, we cannot say that the district court abused its discretion in finding that the public interest is directly served through the issuance of a narrow preliminary injunction. With the issuance of the preliminary injunction the economic voice of the consumer may still be heard; without the preliminary injunction the options of the consumer have already been prescribed by the defendants.

## III. CONCLUSION

In sum, after a complete review of the record in this case, we cannot say that the trial court abused its discretion in finding that the balance of hardships tips sharply in favor of the plaintiffs. Moreover, the record in this case presents serious questions raised by plaintiffs indicating that they have a fair chance of succeeding on the merits of the underlying antitrust litigation. Finally, the district court did not abuse its discretion in finding that the

public interest is better served by the issuance of the preliminary injunction.[7]

The preliminary injunction is AFFIRMED.

BEEZER, Circuit Judge, dissenting.

I respectfully dissent. For the reasons stated below, I believe that the district court employed incorrect legal standards in granting the preliminary injunction.

## I

## BACKGROUND

### A. *Facts*

The only findings of fact made by the district court were as follows:

> The court concludes that plaintiffs have raised *serious questions* relative to their claim that defendants are in violation of 15 U.S.C. § 1 and that this is the case even though plaintiffs' own arrangement with CBS is not above suspicion on the same ground. An analysis of these questions will require a full trial and thoughtful consideration of the quite fluid state of the relationship between major college football and television broadcasters in the aftermath of the Supreme Court's *NCAA* decision. The court further concludes that the balance of hardships *tilts rather sharply* in favor of the plaintiffs with respect to the subject of this proceeding, which relates only to the airing of two games, Nebraska v. UCLA (Sept. 22) and Notre Dame v. USC (Nov. 24). By issuance of this order ABC and ESPN are not measurably harmed, other than by some perceived diminution of their ability quickly to dispatch CBS from the market for nationwide college football

telecasts. The plaintiff universities, however, are clearly harmed in the absence of such order, both monetarily and with respect to the intangibles discussed at length in argument on the motion. The defendant universities will clearly benefit from the order in much the same fashion. The public interest is likewise served by this order. It is a matter of common knowledge that the Rose Bowl is sold out for the Nebraska—UCLA game, which could well determine the "championship" of college football in 1984. Such is the rich tradition of the USC—Notre Dame rivalry that sportly passions would be aroused if both teams were 0–9 at game time.

(emphasis added).[1]

### B. *Standard of Review*

The grant of a preliminary injunction may be reversed if the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact. *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984). A preliminary injunction is proper if the plaintiff shows a combination of: (1) "probable success on the merits" and "the possibility of irreparable injury" or (2) "serious questions" raised on the merits and a balance of hardships that tips "sharply" in the plaintiff's favor. *Id.* at 1421 (quoting *Miss Universe, Inc. v. Flesher,* 605 F.2d 1130, 1134 (9th Cir.1979)). Regardless of which end of the continuum the plaintiff's claim falls on, a showing that the public interest will be served by the injunction is required. *American Motorcyclist Association v. Watt,* 714 F.2d 962, 967 (9th Cir.1983).

---

7. Our disposition of the defendants' appeal from the district court's preliminary injunction should adequately clarify why we also find no abuse of discretion in the trial court's denial of a stay pending appeal. Under a traditional, *see Washington Area Transit Comm'n. v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977), or abbreviated, *Benda v. Grand Lodge of International Association of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979), standard for granting such a stay,

we find no cause to disturb the trial court's ruling under Rule 62(c) of the Federal Rules of Civil Procedure.

1. Fed.R.Civ.P. 52(a) and 65(d) require specific findings when a preliminary injunction is granted. The district court made only the limited findings quoted above. As a result, we do not have the benefit of the complete and detailed reasoning of the district court.

The district court based its decision on the second of the two ends of the continuum. The district court found "serious questions" and a balance of hardships that tipped "sharply" in the plaintiffs' favor. It did not find a mere "possibility of irreparable injury" and a "strong likelihood of success on the merits," which is the opposite end of the continuum. *Sierra Club v. Hathaway*, 579 F.2d 1162, 1167 (9th Cir. 1978).

In general, the decision to grant a preliminary injunction lies within the discretion of the district court. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir.1975). In this case, the district court misapplied the applicable legal standards. As a result, it is not necessary to find an abuse of discretion to reverse the granting of the preliminary injunction.[2]

## II

## THE BALANCE OF HARDSHIPS

The first step in analyzing the granting of the preliminary injunction is to review the balance of hardships. The district court found that the balance of hardships tips sharply in favor of the plaintiffs. In reaching that conclusion, the district court relied upon an erroneous legal standard.

### A. *Hardship to the Plaintiffs*

The district court found that the plaintiffs would be irreparably injured in the absence of the preliminary injunction. It is well-settled that monetary injuries are not irreparable and may not be considered in determining whether a preliminary injunction is proper.[3] *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974); *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1202 (9th Cir.1980); C. Wright & A. Miller, 11 *Federal Practice and Procedure* § 2948, at 434 (1973). This is especially true in an action under the Sherman Act, since a plaintiff can recover treble damages. It is also well-settled that a preliminary injunction cannot be issued to prevent a mere speculative injury. *S.J. Stile Associates Ltd. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A.1981) ("A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where pro-

---

**2.** The defendants urge us to consider the fact that the plaintiffs' contract with CBS contains an exclusivity provision analogous to the provision at issue in this case. *In pari delicto* is rarely, if ever, a defense to an antitrust action. *See* 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 348 (1978). It does not follow, however, that the plaintiffs' actions are irrelevant to the granting of a preliminary injunction. The Second Circuit has stated:

It is true that the *in pari delicto* doctrine is not a defense on the merits, ... but the [plaintiff's practices] certainly can be taken into account in determining the equities as a prelude to ruling on a preliminary injunction, at least where a clear showing of "public interest" has not been made out.

*Columbia Pictures Industries, Inc. v. American Broadcasting Cos.*, 501 F.2d 894, 899 (2d Cir. 1974). The Second Circuit's approach is quite logical: a court should consider the actions of the plaintiff in evaluating claims of hardship. Although the plaintiffs argue that the exclusivity provision in the CBS contract is different from the exclusivity provision in the ABC contract, the district court found that it is "not above suspicion." This fact is useful in evaluating the merits of the plaintiffs' claim of hardship.

The plaintiffs seek to distinguish *Columbia Pictures* on the ground that a "clear showing of 'public interest'" has been made in this case. It should be noted that the Second Circuit did not limit its consideration of a party's conduct to cases in which the public interest is not clear. Moreover, this argument misconceives the logic of the Second Circuit's approach. The plaintiffs' conduct is a factor to be considered, not a bar to equitable relief. Although it is conceivable that the public interest in granting a preliminary injunction could be so strong that it would be prudent to ignore the plaintiff's conduct, this case does not present such a situation. As noted below, the public interest only marginally favors the granting of a preliminary injunction in this case.

**3.** This rule is subject to an exception for cases in which monetary damages either cannot be measured, *see, e.g., Texas v. Seatrain International, S.A.*, 518 F.2d 175, 179 (5th Cir.1975), or are otherwise inadequate, *see, e.g., Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (threat to business' existence). *See generally* Note, *Granting Preliminary Injunctions Against Dealership Terminations in Antitrust Actions*, 67 Va.L.Rev. 1395, 1398–1401 (1981).

spective injury is great. A presently existing, actual threat must be shown."); *New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 755 (2d Cir.1977) (requiring "a showing that the alleged threats of irreparable harm are not remote or speculative but are actual and imminent"); C. Wright & A. Miller, *supra,* § 2948, at 436–38. On application of these principles, the district court's findings do not withstand scrutiny.

The district court found that the plaintiffs would be harmed "both monetarily and with respect to the intangibles discussed at length in argument on the motion." The district court did not find, and there is no reason to believe, that the monetary harm is not compensable by damages. To the extent that the district court relied on monetary damages, it applied an erroneous legal standard.

The plaintiffs assert three "intangible" harms.[4] First, they argue that the denial of the preliminary injunction would substantially reduce the value of their television contract with CBS. To the extent that the contract loses value, however, the

plaintiffs can seek monetary damages. Moreover, any reduction in value would be caused solely by the existence of the ABC–CFA contract. If the plaintiffs prevail at trial, the value of the contract would be fully restored because the ABC–CFA contract would be void. Thus, harm to the CBS contract is not "irreparable" for purposes of a preliminary injunction.

Second, the plaintiffs argue that the denial of the preliminary injunction would impair their recruiting efforts. This argument is extremely speculative. The record reveals that USC is hardly suffering from a lack of television exposure. The game against Notre Dame would be the third *consecutive* USC game televised nationally on CBS.[5] Any harm suffered by the plaintiffs as a result of lack of exposure would be *de minimis.*[6]

Third, the plaintiffs argue that the denial of the preliminary injunction would deprive them of a valuable opportunity to showcase their teams. As noted above, the harm would be *de minimis.*[7] Moreover, the plaintiffs' conduct is highly relevant in

4. The plaintiffs also make the following argument:

If ABC and the CFA succeed in blocking CBS' coverage of the USC-Notre Dame game, as well as other crossover games, CBS may determine that it is unable to continue to televise college football after this season. As a practical matter, the Pac-10/Big Ten will have to join the CFA in order to have their games shown on national network television and ABC will have forced a competitor out of the market for network televising of intercollegiate football games.

Although that argument is imaginative, it is too speculative for purposes of the injunction application. Moreover, if the plaintiffs are correct, they can obtain money damages. The preliminary injunction cannot be upheld on the basis of this argument.

5. The recruiting efforts of UCLA are not at issue in light of the broadcast of the UCLA-Nebraska game. The Big Ten and the Pac-10 cannot assert a conference-wide harm to recruiting unless they can show that the USC-Notre Dame game has a unique effect on the Conferences' ability to recruit athletes. Such a showing has not been made. Thus, only USC's recruiting efforts are at issue.

Schedule A to the CBS-Big-10/Pac-10 letter agreement reveals that CBS plans to televise the

USC-Washington game on November 10 and the USC–UCLA game on November 17. It has been reported that USC will appear in eight televised games this year. Newman, *Greed and Glut?,* Seattle Times, October 6, 1984, at D1, col. 6.

6. The plaintiffs also argue that televising the football game would raise the USC football team's national ranking and would improve its chances of appearing in a post-season bowl game. This argument is utterly speculative. Additionally, the plaintiffs note that televising football games makes it possible to operate large coeducational athletic programs. Any such injury caused by the exclusivity provision is monetary.

7. The Big-10 Conference can claim no harm under this theory because USC is not a Big-10 team. The Pac-10 Conference can claim no harm under this theory because it has no interest in insuring television exposure for USC, rather than another Pac-10 team. The Pac-10 could have insured television coverage for its teams by scheduling an alternative game on the date in question. USC can claim only minimal harm under this theory because, as discussed above, USC receives massive television coverage.

evaluating this claim:[8] the value of the right to showcase the teams cannot be very significant if the plaintiffs were willing to sign a contract with an exclusivity clause.[9]

### B. *Hardship to the Defendants*

In addition to misapplying the legal standards governing the plaintiffs' claims of irreparable injury, the district court completely ignored the defendants' claims of hardship. The district court found that "ABC and ESPN are not measurably harmed, other than by some perceived diminution of their ability quickly to dispatch CBS from the market for nationwide college football telecasts." The preliminary injunction assures CBS the broadcast rights to the USC-Notre Dame game and forecloses competitive bidding by the networks for broadcast rights to the most popular 1984 crossover game. The district court did not address ABC's contention that the preliminary injunction hampers its efforts to develop product identification and to sell its exclusive package to advertisers.[10]

The district court also stated that "[t]he defendant universities will clearly benefit from the order." The district court evidently did not give any weight to the fact that Notre Dame is contesting a preliminary injunction from which it will "clearly benefit." Nor did it even acknowledge the argument advanced by Notre Dame and the CFA that the preliminary injunction will endanger the relations among the CFA member universities and the viability of the national television package that they are attempting to develop. *Cf. FTC v. Warner Communications Inc.*, 742 F.2d 1156, at 1165 (9th Cir.1984) (per curiam) (in an ac-

tion for a preliminary injunction under the Federal Trade Commission Act, noting that equities similar to those alleged by ABC and Notre Dame are "entitled to serious consideration"). A full and fair consideration of the parties' claims required the district court to address these hardships specifically in its findings.

### C. *The Balance of Hardships*

The plaintiffs have failed to establish a substantial injury that is both irreparable and nonspeculative. The district court's conclusion to the contrary is due to a misapplication of the law. The district court's conclusion that the balance between the hardship to the plaintiffs and the hardship to the defendants, which it ignored, tips "sharply" in favor of the plaintiffs is erroneous. The granting of the preliminary injunction was based on an incorrect legal standard.

### III

### SERIOUS QUESTIONS AND LIKELIHOOD OF SUCCESS

The second step in evaluating the granting of the preliminary injunction is to determine whether the plaintiffs demonstrated an adequate likelihood of ultimate success on the merits. The district court found that the plaintiffs have raised "serious questions," which is the lower end of the continuum in the standard for granting a preliminary injunction. This finding would have been sufficient if the balance of hardship tipped "sharply" in favor of the plaintiffs. Since the balance of hardships favors the plaintiffs only to a minute degree, if at all, the "serious questions" standard is inappropriate. However, the injunction can

---

**8.** *See supra* note 2.

**9.** In addition to the exclusivity provision, the letter agreement provided that no Big-10 or Pac-10 team would appear on national television more than four times during the 1984 season. An analogous provision is contained in article 13 of the Big Ten/Pacific-10 Conference Football Television Plan.

**10.** ABC and the CFA claim that the development of a strong national package is necessary in

light of the availability of regional and local broadcasts. They note that games of peculiar local or regional interest, such as Brigham Young-Utah in Utah or California-Stanford in Berkeley will attract a much larger market share in those areas than a game of general national interest, such as USC-Notre Dame. Accordingly, they assert that an exclusive national package is necessary to produce maximum advertising revenues.

be sustained if the record reflects that the plaintiffs have established a "strong likelihood of success on the merits."

## A. *Per Se Rule vs. Rule of Reason*

The starting point for an analysis under section 1 of the Sherman Act is the determination of the appropriate test for legality. The plaintiffs argue that the exclusivity provision is a naked restraint that is illegal per se. The defendants argue that the Rule of Reason is appropriate. The district court evidently chose the latter course.

The types of conduct that are treated as illegal per se are those in which "surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *NCAA v. Board of Regents,* —— U.S. ——, 104 S.Ct. 2948, 2962, 82 L.Ed.2d 70 (1984). The district court did not determine that the exclusivity provisions met that description. On the contrary, the district court found that the resolution of the claims would require "thoughtful consideration of the quite fluid state of the relationship between major college football and television broadcasts." The plaintiffs, however, argue forcefully that the exclusivity is illegal per se as a "naked restraint." *See United States v. Sealy, Inc.,* 388 U.S. 350, 354–58, 87 S.Ct. 1847, 1851–53, 18 L.Ed.2d 1238 (1967); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 210–14, 79 S.Ct. 705, 708–10, 3 L.Ed.2d 741 (1959). The plaintiffs' argument misconceives the nature of "naked" restraints. The exclusivity provision has a purpose other than restraining competition: it allows ABC and the CFA to develop a national college football television package. *Cf. White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963) (holding that "naked restraints of trade with no purpose except stifling of competition" are illegal per se). As a result, *Sealy* and *Klor's* are not controlling.

It is possible to view this arrangement as either horizontal or vertical. *Cf. Sealy,* 388 U.S. at 352, 87 S.Ct. at 1849 (noting that it is necessary to look at substance, rather than form, to determine whether an arrangement is horizontal or vertical). As a horizontal arrangement, the ABC contract is quite similar to the joint selling arrangement reviewed under the Rule of Reason in *Broadcast Music, Inc. v. Columbia Broadcasting System,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). The Supreme Court recognized in *BMI* that the effect of such an arrangement may be to "make" a market, thus stimulating competition. *Id.* at 19–23, 99 S.Ct. at 1562–1564; *see NCAA,* 104 S.Ct. at 2960–62. This is precisely the position advanced by ABC and the CFA.

As a vertical arrangement, the ABC contract closely resembles the territorial restrictions reviewed under the Rule of Reason in *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In *Continental T.V.,* the Supreme Court recognized that vertical nonprice restrictions could stimulate interbrand competition and held that a per se rule was therefore inappropriate. *Id.* at 51–59, 97 S.Ct. at 2558–2562.[11] This is precisely the position advanced by the defendants. *See* Baxter, *Separation of Powers, Prosecutorial Discretion, and the "Common Law" Nature of Antitrust Law,* 60 Texas L.Rev. 661, 697 (1982) (noting that "a firm's choice of distributional arrangements, such as granting franchises or grouping goods and services for sale, may simply reflect the firm's judgment about the efficient and effective way to structure its marketing efforts"). The plaintiffs argue that the exclusivity provision is contrary to interbrand competition because crossover games are eliminated. This argument totally misses the point. The "brands" are the competing network television packages, not the teams. Because the exclusivity provision could enhance the marketing of the CFA football

---

**11.** Vertical price restraints are still illegal per se. *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1469 & n. 7, 79 L.Ed.2d 775 (1984). *See generally* Liebeler, *The Distinction Between Price and Nonprice Distribution Restrictions,* 31 UCLA L.Rev. 384 (1983).

package, the Rule of Reason is appropriate.[12]

## B. *Application*

It is not necessary to apply the Rule of Reason to the facts of this case, given the procedural setting. It is sufficient to note that close issues are presented which must be resolved at trial. While the district court's finding that "serious questions" are raised by this case is correct, the plaintiff has not shown a sufficiently strong likelihood of success to overcome the virtual absence of irreparable injury.[13]

## IV

## THE PUBLIC INTEREST

Even when the evidence supports a finding that the balance of hardships is tipped in favor of the plaintiff, the granting of a preliminary injunction requires a showing that the public interest is served by the injunction. *American Motorcyclist Association*, 714 F.2d at 967. *See generally* Shreve, *Federal Injunctions and the Public Interest*, 51 Geo.Wash.L.Rev. 382 (1983). The district court found that tele-

vising the games served the public interest. While that is undoubtedly true, it is irrelevant. Just as the granting of the preliminary injunction did not guarantee the broadcast of the game, the denial of the preliminary injunction would not have barred the broadcast of the game. Both ABC and CBS claim contractual rights with regard to the broadcast of the USC-Notre Dame game.[14] With the preliminary injunction, CBS will have the right to televise the game with Notre Dame's consent. Without the preliminary injunction, CBS would be required to negotiate with ABC and the CFA for the right to televise the game.[15] Thus, the most significant effect of the preliminary injunction is to determine the relative rights of a party and a nonparty.[16] The public interest is not served by such a determination.

The public interest is served by the preliminary injunction only to the extent that it removes an impediment to the broadcast of the game. To the extent that the district court found a greater public interest, it misapplied the legal standards. This error standing alone, however, does not require reversal.

---

**12.** The plaintiffs also resort to arguing by labels, calling the exclusivity provisions a "group boycott" and a "cartel arrangement." It is now well-established that those terms lack inherent meaning. *See* R. Bork, *The Antitrust Paradox* 330–44 (1978). It is the effect of the arrangement, rather than its form, that is relevant. *See generally*, Bauer, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination*, 79 Colum.L.Rev. 685 (1979).

**13.** The plaintiffs frequently allude to ABC's alleged plan to drive CBS out of the college television market. Such a motivation does not by itself violate the Sherman Act. Regardless of ABC's intent, the plaintiffs must show that the exclusivity provision had an anticompetitive effect. *NCAA*, 104 S.Ct. at 2962 & n. 26; *see* Easterbrook, *Is There a Ratchet in Antitrust Law?*, 60 Texas L.Rev. 705, 708 (1982) ("Apparently-exclusionary conduct is of legitimate concern only if it works to drive out equally or more efficient rivals."). Although the plaintiffs could bring an action for attempted monopolization, they have not done so. In any event, such an action would fail for lack of a "dangerous probability of success." *See* 2 E. Kintner, *Federal Antitrust Law* § 13.4 (1980). It is inconceivable that ABC could monopolize the market

in light of the presence of CBS, NBC, and the various cable networks.

**14.** The plaintiffs claim that they are entitled to arrange for the broadcast of the game without the consent of Notre Dame, the CFA, or ABC because it will be played on USC's home field. Regardless of the merits of that claim, the CBS contract purports to give CBS the exclusive right to televise the game in question.

**15.** Of course, it is also possible that the game would be broadcast on local stations or by syndication. Both contracts permit such broadcasts notwithstanding their exclusivity provisions. Such broadcasts would alleviate any injury to the public interest.

The plaintiffs argue that ABC would refuse to negotiate. If that is the case, however, the plaintiffs' case under sections 1 and 2 of the Sherman Act might be strengthened considerably.

**16.** Although the defendants have not yet filed a responsive pleading, it may ultimately be necessary to join CBS as a plaintiff in this case. *See* Fed.R.Civ.P. 19. As is obvious from this discussion, CBS's rights may be adversely affected by the outcome of this litigation.

## V

### CONCLUSION

In the absence of a balance of hardships tipped sharply in favor of the plaintiffs or a strong likelihood of success, the district court could not properly grant the preliminary injunction. The record reveals that both elements are at the lower end of the continuum: the plaintiff has raised "serious questions" and, arguably, has shown a possibility of irreparable harm. The district court applied incorrect standards in finding that the balance of hardships tipped sharply in favor of the plaintiffs. I would reverse the order of the district court and remand for further proceedings.