ASSOCIATION OF INDEPENDENT
TELEVISION STATIONS,
INC., Plaintiff,

v.

The COLLEGE FOOTBALL ASSOCIA-
TION; The Big Eight Football Confer-
ence; American Broadcasting Compa-
nies, Inc.; ABC Sports, Inc.; Entertain-
ment and Sports Programming Net-
work, Inc., Defendants.

SPORTS VIEW COMPANY, Plaintiff,

v.

The COLLEGE FOOTBALL ASSOCIA-
TION; American Broadcasting Compa-
nies, Inc.; ABC Sports, Inc.; and Enter-
tainment and Sports Programming Net-
work, Inc., Defendants.

Civ. Nos. 84–2283–JB, 84–2367–JB.

United States District Court,
W.D. Oklahoma.

March 20, 1986.

Forrest A. Hainline, III, John H. Hanson, Washington, D.C., Michael Minnis, Oklahoma City, Okl., Michael Medina, Tulsa, Okl., for plaintiff.

Andy Coats, Clyde A. Muchmore, Oklahoma City, Okl., Gary J. Smith, Washington, D.C., Kenneth R. Webster, Oklahoma City, Okl., Clyde W. Curtis, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION

BURCIAGA, District Judge, sitting by designation.

These consolidated actions are for treble damages and injunctive relief for violations of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § 1 *et seq.*, and for tortious interference with contractual and business relations. The plaintiffs Association of Independent Television Stations, Inc. (INTV) and Sports View Company (SVC) challenge a series of television plans and television rights agreements among the defendants the College Football Association (CFA), the Big Eight Football Conference (the Big Eight), ABC Sports, Inc. (ABC), and Entertainment and Sports Programming Network, Inc. (ESPN) conferring rights to telecast football games played by CFA's and the Big Eight's member colleges and universities. INTV and SVC allege that by these agreements the defendants fixed prices, limited output, divided markets, excluded competition, and restricted television viewers' choices among games, and thus unreasonably restrained trade in violation of 15 U.S.C. § 1. They also allege that the defendants have conspired and attempted to monopolize and in fact have monopolized the college football television market in violation of 15 U.S.C. § 2. SVC further alleges that CFA, ABC, ESPN, and the Big Eight tortiously interfered with 1984 telecast rights contracts in which it had interests.

In accordance with Federal Rule of Civil Procedure 56, INTV has moved for summary judgment establishing the antitrust liability of the defendants and enjoining many of their collaborative market activities. SVC has joined in the motion. The motions

do not address SVC's state law claims or the amount of its alleged damages.[1]

## I. STANDARD OF DECISION

INTV and SVC may have summary judgment only after showing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). All doubts must be resolved in favor of the existence of triable issues of fact. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.1975).

■ Allegations of purposeful, concerted action to restrain trade raise questions about commercial purposes and private intentions that are difficult to resolve summarily.[2] Summary judgment is particularly difficult when the anticompetitive effects or procompetitive justifications of complex and novel arrangements must be evaluated. Whether a set of related agreements promotes or suppresses competition is a question not easily answered by summary disposition. The instant cases typify the difficulties inherent in summary adjudication of antitrust matters.

■ Apart from the question of whether the parties directly disagree about the material facts, when a choice of permissible inferences may be drawn from the record the choice must be made in favor of the party opposing summary disposition. As is described below, there are direct factual confrontations between the plaintiffs and

1. In support of their motion, INTV and SVC have submitted a statement of undisputed facts of 68 numbered paragraphs set out on 28 pages. They have filed in support of their motion 15 volumes containing more than 1,200 exhibits. Many of the individual exhibits are themselves constituted of many documents. CFA and the Big Eight have filed contrary statements of disputed facts and their own volumes of exhibits. ABC has filed a 27-page statement of material and contested facts covering 26 pages and has filed its own volume of supporting exhibits. By leave of court, INTV and SVC have replied separately to the defendants.

2. ABC urges the court to adopt a general rule disfavoring summary judgment in antitrust cases, citing *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). In *Poller*, the United States Supreme Court observed that summary procedure "should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." On the basis of this language in *Poller*, it has sometimes been said that summary judgment should be sparingly granted in antitrust cases or that it is less available in complex antitrust matters than in other litigation. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985); *Holter v. Moore & Co.*, 702 F.2d 854, 855 (10th Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983); *Pueblo Aircraft Service, Inc. v. City of Pueblo*, 679 F.2d 805, 806 (10th Cir.), *cert. denied,* 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983). The import of these cases, however, is that factual issues concerning motive and intent create special discovery and evidentiary problems and do not submit readily to summary resolution. Neither *Poller* nor the cases following it in any way exclude antitrust matters from the scope and force of Federal Rule of Civil Procedure 56. Indeed, there are many reasons why summary judgment may be of special service in antitrust matters. Antitrust actions are often borne of commercial disappointment rather than a legal wrong. The great cost of adjudication in time, money, and energy, and the complexity of antitrust issues and the relative inexperience of jurors with the concepts needed to resolve them also counsel that the law should be applied early if the facts are not in dispute. There is also a compelling need for a uniform and foreseeable interpretation of the antitrust laws. Summary judgment therefore must get careful consideration in these cases. *See First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336, 338 (10th Cir.), *cert. denied,* 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); *Baum v. Gillman*, 648 F.2d 1292, 1295–96 (10th Cir.1981) ("there is nothing unique in antitrust actions which precludes application of the rule [Federal Rule of Civil Procedure 56]"); *Farnell v. Albuquerque Publishing Co.*, 589 F.2d 497 (10th Cir.1978); *Alt v. American Income Life Insurance*, 337 F.2d 472 (10th Cir.1964); II P. Areeda & D. Turner, *Antitrust Law* ¶ 316, 57–58 (1978); J. von Kalinowski, *Antitrust Laws & Trade Regulation* ¶ 113.02, 113–15 (1985). The court therefore rejects ABC's argument urging adoption of a general rule against summary adjudication of antitrust matters.

the defendants in these cases. But even if INTV's and SVC's allegations of subsidiary facts were taken as true, the court could not permissibly select from competing inferences that might be reasonably drawn from the present record and grant summary judgment. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

After careful consideration of all the evidence and the briefs of counsel, the court determines that these cases present genuine issues of material fact and that INTV and SVC therefore are not entitled to judgment as a matter of law. Accordingly, INTV's and SVC's motions for summary judgment must be denied.

## II. THE CHALLENGED ARRANGEMENTS

In order to analyze the factual contentions of the parties it is necessary to set out the essential terms of the challenged agreements. SVC's claims for damages against the defendants are based upon television rights agreements between CFA, ABC, and ESPN for the 1984 college football season. INTV's claim for injunctive relief is grounded on the alleged illegality of the same 1984 agreements, which INTV asserts are perpetuated in subsequent agreements covering the 1985 and 1986 seasons. With certain exceptions not essential to resolution of the pending motions, therefore, the challenged arrangements are embodied in the 1984 contracts.

### A. THE CFA–ABC SPORTS AGREEMENT

The broad contours of the plan adopted under the July 20, 1984 CFA agreement with ABC Sports are not in dispute and included the following provisions:

1. *Exclusive* [3] *national network rights.* ABC Sports and ESPN were granted exclusive national network television rights to CFA games and CFA members were prohibited from appearing on any other national network regardless of the time of the game, whether the CFA opponent was itself a CFA member, and whether the CFA opponent had a contract with another network.

2. *Exclusive time period.* ABC Sports had exclusive rights to televise CFA member games from 3:30 to 7:00 p.m. eastern time during most Saturdays of the 1984 college football season and no other game in which a CFA member participated could be televised during this time period.

3. *Selection of network games.* ABC Sports was required to select its game of the week by 12 days before the Saturday of the telecast, except that games to be telecast in September were to be selected before the 1984 season began.

4. *Number of exposures and appearances.* [4] ABC Sports was to offer its viewers 13 exposures of CFA games and a presentation of a total of 20 games during the 1984 season. Each CFA member was to appear on ABC Sports no more than three times during 1984, but two CFA members were to be selected for a "wild card" appearance and thus could appear a fourth time.

5. *Other telecasts.* CFA members were free to arrange telecasts of their games not selected by ABC Sports or ESPN provided kickoff of such games was not later than

**3.** The parties agree that the rights conveyed by CFA and the Big Eight under the challenged arrangements are not absolutely exclusive in an ordinary sense, since members can sell television rights outside the plans. The term "exclusivity," however, has been used by the parties to refer to the time and territorial restrictions that the plan imposes on members for the benefit of the networks. The court adopts this practice of the parties.

**4.** An "exposure" is actual broadcast or cable time, usually three and one-half hours, during which a game or games may be shown. More than one game may be presented during the same exposure. For example, the network might decide to air one game in the east and a different game in the west at the same time, that is, during the same exposure; these games are called "split-national" games. Alternatively, the network might air three or more "regional" games during the same exposure. The network might, of course, choose to air only one game of intense national interest during an exposure, thus presenting the same game to the entire national audience.

12:20 p.m. eastern time or 11:34 a.m. central or mountain time.

6. *Price and payment.* CFA members were to be paid $12 million for their appearances on ABC Sports during the 1984 season. CFA was to receive the payment on behalf of CFA members and was to allocate revenue among its members according to a formula. There was no provision for ABC Sports to negotiate the prices of individual games with individual CFA members.

7. *Contract duration.* The agreement was for one year. ABC Sports was granted a right of first negotiation if CFA decided to sell a package of its members' games for the 1985 season.

## B. THE CFA–ESPN AGREEMENT

Similarly, the skeleton of the July 24, 1984 CFA agreement with ESPN is not a subject of serious dispute. Its basic provisions were:

1. *Exclusive national network rights.* ESPN and ABC Sports were granted exclusive national network rights to CFA games and CFA members were prohibited from appearing on any other national network regardless of the time of the game, whether the CFA opponent was itself a CFA member, and whether the CFA opponent had a contract with another network.

2. *Exclusive time period.* ESPN was granted exclusive rights to telecast CFA member football games from 7:30 to 11:00 p.m. eastern time on Saturdays during the 1984 season and no other game in which a CFA member participated could be televised in whole or in part during this time period unless the game qualified as an "access" or "pay-per-view" telecast.[5]

3. *Selection of games.* ESPN was required to select its game of the week by 12 days before the Saturday of the cablecast, except for September games which were to be selected before the 1984 season began. ABC Sports had first choice and ESPN could not select a game already selected by ABC Sports. No game selected by ABC Sports or ESPN could be telecast or cablecast as an access or pay-per-view game.

4. *Number of exposures and appearances.* CFA and ESPN agreed to 15 exposures and telecasts of 15 games during the 1984 season. Each CFA member was limited to one appearance on ESPN during 1984, except that a second appearance might be made late in the season under certain circumstances, and each CFA member was limited to a total of four appearances on ABC Sports and ESPN. Each member was limited to two access telecasts or three pay-per-view cablecasts and no more than a total of three access and pay-per-view appearances.

5. *Other telecasts.* The ESPN agreement did not infringe the right of CFA members under the CFA agreement with ABC Sports to arrange telecasts of their games not selected by ABC Sports or ESPN provided kickoff of such games was no later than 12:20 p.m. eastern time or 11:34 a.m. central or mountain time. CFA members also were allowed access and pay-per-view telecasts during ESPN's exclusive time period. The geographical reach of an access telecast was limited to the grade B contours of local television stations serving the areas in which the competing colleges or universities were located, or approximately the reach of a television transmitter. The geographical reach of pay-per-

---

5. "Access" and "pay-per-view" telecasts are essentially exceptions to the time-period exclusivity granted by CFA to ESPN. They are important because they represent direct competition between the network game selected by ESPN and a competing local telecast offered at the same time by a CFA member. An "access" telecast is an over-the-air presentation of a game played by one or more CFA members shown at the same time as the ESPN game of the week. A "pay-per-view" game is a game communicated to paying viewers via cable television facilities in the home state or states of CFA members playing a game at the same time as the ESPN game of the week. Thus, access and pay-per-view telecasts hold the potential to draw local audiences from the game selected by ESPN for national cablecast. The parties dispute the significance of this competition and also dispute the circumstances under which CFA members are contractually entitled to sell access and pay-per-view rights to their games after such games have been "passed" by ABC and ESPN, that is, not selected as the game of the week.

view games was limited to the home state or states of the competing teams. To qualify as an access or pay-per-view game, the game must also originally have been scheduled at night and any CFA participant was required to make an effort to move the game to an earlier time; only if such effort was unsuccessful could the game qualify for access or pay-per-view treatment. Kickoff of all access and pay-per-view telecasts was required to be no later than 20 minutes after kickoff of the ESPN game.

6. *Price and payment.* ESPN was to pay $9.3 million to CFA members for their appearances on ESPN during the 1984 season. CFA was to receive the payment on behalf of CFA members and was to allocate revenue among its members according to a formula. There was no provision for ESPN to negotiate the prices of individual games with individual CFA members.

7. *Contract duration.* The contract was for one year. ESPN was granted a right of first negotiation if CFA decided to offer a package of its members' games for the 1985 season.

## C. THE BIG EIGHT–KATZ AGREEMENT

INTV and SVC also charge that the 1984 Big Eight television plan and contract with Katz Communications, Inc. (Katz) were illegal and are perpetuated in current agreements. The essential provisions of the plan are undisputed:

1. *Exclusive Rights.* Katz was given the exclusive right to select from among the Big Eight games for telecast and Big Eight members could not televise any game that overlapped with the conference game selected by Katz.

2. *Appearances.* Each Big Eight member was limited to three appearances, except that the University of Nebraska and the University of Oklahoma were limited to five total appearances on ABC, ESPN, and Katz combined.

3. *Price.* The Big Eight was paid a specified sum for each conference game televised and the proceeds were distributed among Big Eight members by a formula

specified by conference rules and regulations.

## III. RESTRAINTS OF TRADE

INTV alleges that the defendants' television rights agreements are *per se* violations of § 1 and that they must fall in any event under the rule of reason. For the reasons set out below, the court concludes that INTV and SVC have not established beyond factual dispute that the challenged arrangements constitute *per se* illegal price fixing, output restrictions, or division of markets. Moreover, INTV's and SVC's rule of reason claims are burdened with material factual disputes concerning market definition and power, the anticompetitive effects of the agreements, and the business reasons offered to justify them. The court therefore concludes that INTV and SVC are not entitled to a judgment that the defendants have unreasonably restrained trade as a matter of law.

### A. MODE OF ANALYSIS

■ Not all combinations that restrain interstate trade or commerce violate the antitrust laws. Only unreasonable restraints are forbidden. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Tekton, Inc. v. Builders Bid Service of Utah, Inc.,* 676 F.2d 1352, 1354 (10th Cir.1982). To determine whether a restraint is reasonable, the nature and effect of the restraint must be considered as well as the setting in which its force is felt. *United States v. American Linseed Oil Co.,* 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923).

■ There are two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are illegal *per se.* In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed; these restraints must be tested by the rule of reason. *National Society of*

*Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). By whatever rule it is measured, the challenged restraint ultimately must stand or fall depending upon whether it merely regulates and thereby perhaps promotes competition or whether it tends to suppress or ultimately destroy competition. *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.,* 705 F.2d 1203, 1208 (10th Cir.1982), *cert. denied,* 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).

█ Any "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than … upon formalistic line drawing." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977). For a number of reasons, the court concludes that INTV and SVC have not established beyond factual dispute that the challenged arrangements, "because of their pernicious effect on competition and lack of any redeeming virtue [should be] conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). On the record now presented, the challenged agreements cannot be condemned as illegal *per se.*

### 1. NEED FOR COOPERATION

Agreements among competitors to limit output, fix prices, or divide markets are condemned *per se* because of the overwhelming probability that such practices will work anticompetitive results. In *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma,* the United States Supreme Court rejected *per se* condemnation of practices with ancillary impact on prices or output in the intercollegiate football market, however, because it is "an industry in which horizontal

restraints on competition are essential if the product is to be available at all." *Board of Regents,* 468 U.S. 85, ——, 104 S.Ct. 2948, 2953, 82 L.Ed.2d 70 (1984).

Not all agreements among competitors are illegal *per se* or even illegal at all. Some horizontal arrangements increase market efficiency and therefore are pro-competitive. Cooperative activities among competitors may increase the aggregate output of the sellers and thus serve the goals of competition. Moreover, certain horizontal arrangements, by regulating limited aspects of the market, may enhance marketwide competition. These regulatory measures, even though their force may be felt in usually sacrosanct areas such as price and production, may be justified if their purpose and effect are to increase competition in the market as a whole.

The need for horizontal cooperation in intercollegiate football is not limited to arrangements for the playing of the game. It is apparent that some cooperation is essential in order for the *televised product* to be available at all. For example, if two colleges each sell season-long exclusive rights to televise their own games and then meet in competition on the playing field, their output may be restricted rather than enhanced by their unilateral and incompatible sales of rights. In light of the competing "exclusive" rights to televise the game, no game might be aired at all. The antitrust laws were not designed to spawn chaos by requiring each competitor utterly to ignore the interests of others in the market. The policy of antitrust favors competition but it does not oppose cooperation. When cooperation fosters production and efficiency, as it can, it is not to be condemned *per se.*

INTV and SVC assert that the need for collaboration to adopt and enforce rules setting or controlling the size of the field, the number of players on a team, physical violence in the game, or pay of amateur athletes, all accomplished by virtue of the organizing force of the NCAA, precluded application of the *per se* rule to the NCAA television plan.[6] Since the CFA performs

---

**6.** The NCAA television plan continues as a source of controversy among the parties.

no rule-making function and is unnecessary to the future of college football, neither the CFA nor its television plan are "essential if the product is to be available at all," and CFA's and the Big Eight's agreements therefore are not entitled to the closer review afforded under the rule of reason.

INTV and SVC thus understand *Board of Regents* to hold that only restraints accompanying "rule-making integration" justify rule of reason analysis, and that pure marketing arrangements unrelated to the rules of the game may be condemned as *per se* antitrust violations. This position misunderstands the reach of *Board of Regents.* In the marketing of television rights, just as in the management of the live contest itself, some cooperation is necessary if the product, live college football television, is to be available at all. Such arrangements should not be denied fair market analysis unless and until it appears that they are naked restraints on competition.

■ Even if it were already established beyond factual dispute that the challenged television rights agreements worked price distortions or restricted output, it would be premature to condemn them *per se.* It is clear that we find the restraints in an industry in which agreements among competitors are necessary if the product is to be available at all. The reasoning of the United States Supreme Court is as applicable to restraints by the CFA as it is to restraints imposed by the NCAA. It is not the nature, purpose, or membership of the organization engaged in the conduct that determines whether a restraint may be condemned *per se* or whether it may pass under the rule of reason; it is the nature of the *industry* in which the restraint appears. If the industry is such that cooperation among competitors is a commercial necessity, the agreements which permit

such cooperation should ordinarily warrant the discriminating review afforded by the rule of reason. Only if the cooperative arrangements are revealed to be naked restraints should they be condemned *per se.*

## 2. JOINT MARKETING

Joint ventures among competitors, including joint selling arrangements, may unleash positive economic forces and thus advance the ends of competition. Collaboration by competitors is not illegal when its purpose and principal effects are to increase production, streamline distribution, and otherwise spur competition. *See Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). It is commonplace that these desirable results are necessarily accompanied by restrictions on competition among the venturers. These restraints may be legitimately ancillary to the larger venture if, and only if, they are "limited to those [restrictions] inevitably arising out of dealings between partners, or necessary (and of no broader scope than necessary) to make the joint venture work." *In re Brunswick,* 94 F.T.C. 1174, 1275 (1979), *aff'd sub nom. Yamaha Motor Co. v. FTC,* 657 F.2d 971 (8th Cir.1981), *cert. denied sub nom. Brunswick Corp. v. FTC,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 174 (1982).

The CFA asserts that it, unlike the NCAA before it, is an authentic joint selling agency. CFA asserts that it is a truly voluntary organization that permits its constituent members to offer a new and distinct product, a right of first refusal to a specified number of games. CFA cannot discipline its members or otherwise enforce the group will at the expense of members. The restraints imposed serve the individual interests of the members and their only function is to permit the packaging and

---

INTV's and SVC's claims are grounded on their contention that the CFA and Big Eight plans perpetuate the NCAA intercollegiate football cartel and that the offensive provisions of the NCAA plan earlier enjoined by this court are reproduced with only legally insignificant modifications in the 1984 and subsequent CFA and Big Eight plans. ABC, CFA, and the Big Eight, on the other hand, contrast the 1984 and later plans with the NCAA plan and argue that current television rights arrangements are different from the earlier plan and are procompetitive and legal. The basic terms of the NCAA television plan are set out in *Board of Regents,* 468 U.S. 85, 104 S.Ct., at 2959.

sale of an otherwise impossible national series of games.

If true, these assertions would entitle CFA to further market analysis. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *see also Copperweld Corp. v. Independence Tube Corp.,* — U.S. ——, 105 S.Ct. 319, 83 L.Ed.2d 257 (1984) ("joint ventures ... hold the promise of increasing a firm's efficiency and enabling it to compete more effectively [; s]uch combinations are judged under a rule of reason ...").

### 3. INTERBRAND COMPETITION

■■■ CFA, ABC, and the Big Eight characterize the challenged arrangements as marketing agreements that impose limited and necessary intrabrand restraints in order to effect a more vigorous interbrand competition. It is clear that a marketing strategy which, by effecting intrabrand efficiencies, increases output and is thus procompetitive is not ordinarily to be condemned *per se,* even if it regulates price and output.[7] This court cannot on the record now before it determine whether the challenged restrictions are permissible intrabrand regulations or illegal interbrand restraints. Since the product of one college football team alone is without apparent value, some combinations of competing institutions must be necessary and therefore reasonable. These combinations also must be capable of enforcing some collective regulation upon their members to achieve intrabrand stability and thus bolster their competitive positions. The court therefore must decide, as a threshold matter, what constitutes a "brand" of intercollegiate football: does each competitor, pair of competitors, conference, or larger combination offer its own brand?

Only after deciding what constitutes a brand of intercollegiate football can the court discern whether the challenged arrangements are vertical intrabrand regulations or more suspect interbrand collaboration. As the Supreme Court recognized in *Sylvania,* there may be "problems in differentiating vertical restrictions from horizontal restrictions." 433 U.S., at 58 n. 28, 97 S.Ct. at 2561 n. 28 (1977). However difficult the categorization may be, it is a critical step in any judgment about the legality of the restraints.

■■■ Vertical restrictions limiting intrabrand competition in order to increase interbrand strength may be justified by procompetitive purposes and effects while horizontal restraints among interbrand competitors ordinarily are of no value. ABA Antitrust Section, *Antitrust Law Developments* 18–19 n. 125 (2d ed. 1984).

If the challenged arrangements are judged to be intrabrand regulation, as the defendants contend, their purpose and effect must still be tested to determine whether they intend and achieve a procompetitive effect on balance. Such arrangements require a balancing of the effects of the intrabrand restraints against the stimulation of interbrand competition. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 51–54, 97 S.Ct. 2549, 2558–59, 53 L.Ed.2d 568 (1977). Moreover, intrabrand restraints, if the CFA or Big Eight

---

7. *See Board of Regents,* 468 U.S., at ——, 104 S.Ct., at 2961–62 ("despite the fact that this case involves restraints on the ability of member institutions to compete in terms of price and output, a fair evaluation of their competitive character requires consideration of the NCAA's justifications for the restraints"); *id.,* 104 S.Ct. at 2968 n. 55 ("if the NCAA faced interbrand competition from available substitutes, then certain forms of collective action might be appropriate in order to enhance its ability to compete"); *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 23–24, 99 S.Ct. 1551, 1562–63, 1564–65, 60 L.Ed.2d 1 (1979) ("[n]ot all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints[;] ... [j]oint ventures and other cooperative arrangements are also not usually unlawful ... where the agreement on price is necessary to market the product at all"); *see also Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 51–57, 97 S.Ct. 2549, 2558–61, 53 L.Ed.2d 568 (1977) (approving vertical intrabrand restraints that foster interbrand competition); *Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 376–77, 53 S.Ct. 471, 480, 77 L.Ed. 825 (1933) (approving joint sales agency).

television plan can be so characterized, are justifiable only when the market in which they are imposed is sufficiently diverse; it is vital that the product substitutes are available. Interbrand competition thus serves as its own check on the intrabrand restraints. *Sylvania*, 433 U.S., at 52 n. 19, 97 S.Ct. at 2558 n. 19. The market power wielded by one imposing intrabrand restrictions is thus very pertinent to judgments about such arrangements. Market share, the extent of product differentiation, and the strength of the interbrand competitors are all crucial to this inquiry. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 615, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); *United States v. Columbia Steel Co.*, 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948).

Since the defendants' market power is the subject of serious dispute, as is discussed below, the court cannot yet discern whether the restraints imposed by CFA and the Big Eight are impermissible interbrand arrangements.[8]

### B. MARKET DEFINITION AND POWER

Since INTV and SVC have not established that the challenged arrangements should be condemned *per se*, it becomes essential to their claims that the relevant market be defined and proved and that the defendants be shown to have power in the market defined.[9]

### 1. MARKET DEFINITION

■ To establish a relevant market, INTV and SVC must show a sufficiently discrete and separate product market and the product must not be reasonably interchangeable or competitive with other products in kind or price. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *Olsen v. Progressive Music Sup-*

---

**8.** In a related matter, the Big Eight asserts that it is a "single entity" and is therefore incapable of combining or conspiring with itself in violation of the antitrust laws. The courts have considered frequently, with varying results, whether sports leagues are single entities or combinations. Precedent is of no particular value, however, since each league is *sui generis* and claims its own unique status. The Big Eight has presented enough evidence of its unitary purpose to warrant further inquiry into the facts supporting this defense. It should also be noted that the treatment as separate entities of member clubs of professional sports leagues has been seriously criticized. *See National Football League v. North American Soccer League*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982) (Rehnquist, J., dissenting from denial of certiorari); Roberts, *Sports Leagues and the Sherman Act: The Use and Abuse of Section 1 to Regulate Restraints on Intraleague Rivalry*, 32 U.C.L.A.L. Rev. 219, 223–26 (1984); Grauer, *Recognition of the National Football League as a Single Entity Under Section 1 of the Sherman Act: Implications of the Consumer Welfare Model*, 82 Mich.L. Rev. 1, 33–35 (1983).

**9.** INTV offers three theories upon which it contends it is entitled to relief even in the absence of proof of a relevant market or of market power, but INTV is not entitled by any of these to summary judgment. INTV correctly states that a *per se* violation of § 1 requires no market definition or showing of power, citing *Arizona v. Maricopa County Medical Society*, 457 U.S.

332, 341 n. 11, 102 S.Ct. 2466, 2471 n. 11, 73 L.Ed.2d 48 (1982), *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309–10, 76 S.Ct. 937, 939–40, 100 L.Ed. 1209 (1956), and *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed.2d 1129 (1940). But INTV has not proved a *per se* violation. For the reasons set out above, the court cannot at this stage of the proceedings condemn the defendants' arrangements as unlawful *per se*. INTV correctly maintains that agreements that distort prices, reduce output, or subvert market choices and are unaccompanied by procompetitive justifications may violate § 1 under the rule of reason and may be condemned even in the absence of market power, citing *Board of Regents*, 468 U.S. ——, 104 S.Ct., at 2965 n. 42. However, there are factual issues that must be resolved before the court can determine whether the CFA or Big Eight plans fix prices, reduce output, or constrict viewer choice. The court also is faced with factual disputes material to its evaluation of the procompetitive justifications alleged by the defendants. INTV points out, also accurately, that market power need not be shown to prove a conspiracy to monopolize in violation of § 2, citing *Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 576 (10th Cir.1975). To establish such a violation, however, INTV must prove the defendants' specific intent to monopolize. This question is the epitome of the inferential conclusion least amenable to judgment based on documents, and the court is unable and unwilling to decide this question upon the present record.

**1300**

*ply, Inc.*, 703 F.2d 432, 437 (10th Cir.), *cert. denied*, 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983).

Market definition is at best an imprecise task. The determination of the relevant product and geographic market is ordinarily a question of fact. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 n. 4 (10th Cir.1984); *aff'd,* ―― U.S. ――, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1561 (10th Cir.1984), *reversed on other grounds*, 782 F.2d 855 (10th Cir.1986) (*en banc*); *see Telex Corp. v. IBM Corp.*, 510 F.2d 894, 915 (10th Cir.) (*per curiam*), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); ABA Antitrust Section, *Antitrust Law Developments* 110–11 (2d ed. 1984). Hence INTV and SVC cannot entirely rely on a market defined in the past; such a marketplace may have experienced radical change.

■ Factual disputes prevent summary definition of the relevant market. The defendants contest, with sufficient supporting probative evidence to raise a genuine question, INTV's and SVC's assertion that the relevant market is live college football television. CFA and the Big Eight assert that the relevant product market includes professional football. ABC maintains that the market is even wider and includes all fall sports programs. These disputes preclude summary judgment of INTV's and SVC's claims under the rule of reason and their claims of monopolization.

A significant factual dispute exists about whether rights to telecast the games of the United States Football League (USFL) are within the relevant product market.[10] CFA and the Big Eight contend that the USFL's proposed move to a fall schedule in 1986 creates a product market that is wider than live college football television.[11] INTV and SVC oppose consideration of the USFL's fall schedule because they contend that the

**10.** In its original answers to the complaints in these cases, CFA admitted that the relevant product market is telecast rights to intercollegiate football games as found earlier by this court in *Board of Regents.* On January 8, 1985, the United States Department of Justice issued an opinion that the United States Football League (USFL) can lawfully televise its football games on Saturdays in the fall. CFA subsequently with leave of court amended its answers to deny the market asserted by INTV and SVC.

**11.** CFA and ABC state, and INTV and SVC do not dispute, that: on November 19, 1984, Commissioner Chester R. Simmons of the USFL, in accordance with the procedure set out at 28 C.F.R. § 50.6 (1984), requested a business review letter from the Antitrust Division of the United States Department of Justice stating its enforcement intentions with respect to the league's proposal to telecast its games on Saturday afternoons commencing in the fall of 1986. The USFL recognized that its plan, because it contemplated Saturday, rather than Sunday, telecasts was not exempted from the antitrust laws by the Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291–95, which grants a limited antitrust exemption to joint marketing of television rights by professional football, baseball, basketball, and hockey teams. On January 8, 1985, the government issued its business review letter expressing no intention to institute enforcement proceedings challenging the USFL plan. Declining to apply the *per se* rule to the plan, the government expressed the view that the exclu-

sivity provisions were, given then current market conditions, procompetitive and therefore permissible under the rule of reason. The government enforcement intentions, however, were bound to market conditions. The review letter noted the disparity between television revenues of the NFL and the USFL. The government noted that the USFL is a "new and struggling venture" seeking to compete with the "more established" NFL. The government noted the importance of television revenues to the new league's ability to attract competitive athletic talent by offering comparable salaries and thus the significance of television revenues to the continued survival of the league. Relying on information provided by the USFL, the government assumed that the USFL drew far lower ratings and far smaller audience shares than the NFL, and that each USFL team therefore earned only $1.3 million in television revenues during 1984 as compared with $14 million for each NFL team. Because television revenue accounted for an average of 26.6 percent of each USFL club's total revenue, USFL clubs lost an average of $3.5 million in 1984 and were placed at a marked competitive disadvantage. The USFL also represented to the government that the league had no power, even in the limited professional football market, that no network would contract for the television plan without the subject restrictions, and that without a television pact the USFL would die.

USFL will not mitigate the alleged anticompetitive effects of the challenged agreements.

INTV and SVC do not directly contest the assertion that the USFL is now a potential exhibitor on Saturday afternoons in the fall. Rather, they suggest that the USFL's failing financial base and lack of appeal among fans render it a weak competitor. Whether many fans will watch USFL games during a fall schedule may be relevant in determining CFA's and the Big Eight's market power, but it does not bear on the definition of the product market. The inclusion or exclusion of the USFL from the relevant product market is therefore a disputed factual issue at the heart of this controversy. This dispute alone precludes summary judgment under the rule of reason. *See California Steel & Tube v. Kaiser Steel Corp.,* 650 F.2d 1001, 1003–1004 (9th Cir.1981) (factual disputes over geographical or product market counsel against summary judgment). The court cannot judge the credibility of INTV's assertions that the very existence of the USFL in 1986 is "highly uncertain" because of the league's "precarious financial state" and the "defection of at least one team because of the move to the fall" or INTV's flamboyant observation of the USFL's "precipitously declining attendance levels and television ratings" and its characterization of USFL contests as "games no one wants to see." [12] Certainly INTV has not proved these assertions and just as certainly the defendants contest them. If the USFL's survival is in question, no sound prognosis can be made on the record now before the court.

ABC contends that the relevant product market includes at least all fall sports programming. Relying on the affidavit of Larre Barrett, vice president for sports sales of the ABC television network, ABC contends that CFA advertisers typically allocate a portion of a quarterly budget to achieve a preferred number of impressions on the male audience and that these advertisers spend resources on competitive programming reaching the target group; such alternate programs at least include professional football, major league baseball, tennis, and special athletic events.

ABC also alleges significant changes in the attractiveness of college football in comparison with other programming and thus suggests the possibility of a still broader market. ABC's average rating for CFA football during 1984 was 8.3, down from 9.9 in 1983, and the drop in viewership was reflected in a decline in the value of advertising spots during CFA games: from $60,000.00 or $7.01 per 1,000 viewers for 30 seconds in 1983, to $27,500.00 or $3.96 per 1,000 viewers for 30 seconds in 1984. These declines result in increased competition with other program offerings. In head-to-head competition with CFA football, other shows did well. Less than one-half of the afternoon audience watched CFA football. In November 1984, NBC's non-football programming attracted higher ratings than ABC's CFA football in the same time period in six of the nine largest television markets. In all nine markets, the combined rating of independent television stations was higher than CFA football.

It is clear that significant changes were wrought by *Board of Regents* in the market in which live intercollegiate football television rights are sold. Important factu-

---

**12.** In support of its contention that the USFL is not a viable competitor with CFA and Big Eight football, INTV has filed three newspaper articles about the USFL published in *USA Today* on April 25, 1985. These articles do nothing to settle the dispute about the USFL's competitive potential. They do report the league's financial difficulties and that the owners of the Tampa Bay Bandits intend to drop out of the league if the season is shifted to the fall, but they also report that the Bandits drew an average crowd of 46,854, including ticket giveaways, during the USFL's last season and that the New Jersey Generals drew an average crowd of 43,160, up 14 percent from 1984, and other positive developments. Moreover, INTV and SVC do not dispute CFA's contention that it has had 11 defections during the past year, and apparently do not believe that these defections signal the imminent collapse of CFA. The court simply cannot arrive at an informed conclusion about the competitive vigor of the USFL based upon the present record.

al disputes are presented that prevent summary disposition of INTV's and SVC's claims.

## 2. MARKET POWER

Because the CFA and Big Eight plans are attended by proffered procompetitive justifications that are the subject of factual dispute and thus cannot now be condemned *per se*, INTV and SVC must demonstrate the defendants' market power. *See Hand v. Central Transport, Inc.*, 779 F.2d 8, 11 (6th Cir.1985); *Graphic Products Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560, 1568–70 (11th Cir.1983); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir.1982).

 Market power is the ability to raise price significantly above the competitive level without losing all of one's business, and to exclude competition from a relevant market. *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.*, 783 F.2d 159 (10th Cir. 1986). CFA alleges that no group now competing in the television football industry has such power. CFA alleges that telecasters, including ABC and ESPN, could have turned to at least 15 national, regional, and local packages during 1984, to at least the Big 10–PAC 10, the Atlantic Coast Conference (ACC), and three independents in 1985, and potentially to the USFL in 1986.

 The court need not ignore realities that are plainly before it. The CFA is a powerful entity constituted of colleges and universities with renowned football traditions. Nonetheless, it remains to be demonstrated beyond reasonable factual dispute that CFA can both control price and restrict entry to the college football television market. The market is a different one than the court analyzed in 1982. Unlike the NCAA, CFA and the Big Eight have their rivals.

CFA also argues that it has no market power because its members, as in *BMI*, are free to sell individual games while participating in the CFA plan; that is, a CFA member might play a morning schedule and be free to sell rights to its games unfettered by the CFA plan. Moreover, argues CFA, members are free to opt out of the marketing plan altogether and market telecast rights to their games individually while remaining members in good standing of CFA. Those teams that can increase output by marketing their games outside CFA may do so, and some have: the ACC and three other CFA members sold their network games to CBS for 1985–86 and CFA contends it actively encourages these institutions to remain in the organization. Thus, CFA contends it is a fluid marketing plan in which the perceived immediate economic interests of members find expression, with no barriers to exit from the organization. It is not a coercive combination that distorts the unilateral business judgment of individual conferences, colleges, and universities. CFA's and the Big Eight's own members therefore must be viewed as competitors in judging CFA's and the Big Eight's market power.

Although it cannot seriously be contended that CFA and the Big Eight are only insignificant players in the college football or related marketplace, there is nevertheless a dispute as to whether the altered market is one in which CFA is capable of inflicting economic harm on its rivals. *Regents of the University of California v. American Broadcasting Companies, Inc.*, 747 F.2d 511, 522 (9th Cir.1984) (Beezer, J., dissenting); *see Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 437 (10th Cir.), *cert. denied*, 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983).

## C. THE ALLEGED RESTRAINTS

### 1. PRICE FIXING

 Price fixing agreements are *per se* violations of the antitrust laws. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1151 (10th Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *Bryan v. Stillwater Board of Realtors*, 578 F.2d 1319 (10th Cir.1977). A price-fixing arrangement, whether horizontal or vertical,

need not set a fixed and specific price; any combination or conspiracy "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce" is illegal *per se. United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–22, 60 S.Ct. 811, 843–44, 84 L.Ed. 1129 (1940); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984); *Albrecht v. Herald Co.*, 390 U.S. 145, 152–53, 88 S.Ct. 869, 872–74, 19 L.Ed.2d 998 (1968); *see Simpson v. Union Oil Co.*, 377 U.S. 13, 20–21, 84 S.Ct. 1051, 1056–57, 12 L.Ed.2d 98 (1964); *cf. United States v. Parke, Davis & Co.*, 362 U.S. 29, 45–47, 80 S.Ct. 503, 512–13, 4 L.Ed.2d 505 (1960); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1477 (10th Cir., *cert. denied,* —— U.S. ——, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985); *AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 705 F.2d 1203, 1205–06 (10th Cir.1982), *cert. denied,* 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).

However, "[n]ot all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979). Whether a particular arrangement is price fixing "is not a question simply of determining whether two or more competitors have literally 'fixed' a price." As in the case of intercollegiate football, "[j]oint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all." *Id.*, at 19–21, 99 S.Ct. at 1562–63.

INTV and SVC contend that the collective action of the defendants permitted them to grant exclusive rights to the defendant telecasters and to eliminate head-to-head competition with the packages, that is, with the network series as selected by ABC and ESPN, and that CFA and the Big Eight thus could command an artificially high price for the rights conveyed. INTV

and SVC maintain that the prices of the games actually televised would have been lower had the teams negotiated television rights separately. INTV and SVC assert that under the price and payment arrangements of their television plans, CFA and Big Eight members were compensated equally "regardless of their skill, their experience, [or] their training," in violation of principles articulated in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 357, 102 S.Ct. 2466, 2479, 73 L.Ed.2d 48 (1982). Finally, INTV and SVC allege that the flat payments by ABC and ESPN to CFA, and the distribution of the proceeds by formula to CFA members, constitute an illegal price-fixing conspiracy. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1475–76 (10th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985); *Black Gold, Ltd. v. Rockwool Industries, Inc.*, 729 F.2d 676, 685–896, *on rehearing,* 732 F.2d 779 (10th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984). ABC, CFA, and the Big Eight do not dispute the amounts or manner of payment and distribution of revenues under the agreements, but they contest that these constitute price fixing.

In *Board of Regents,* major colleges and universities contested the formula by which the NCAA divided the revenue for all games because their own games were worth more on the market than was yielded by the formula and viewer preference was distorted. *See also Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1512–13, 1525 (10th Cir.1984), *aff'd,* —— U.S. ——, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (operator of one ski mountain challenged division of revenue by monopolist operator of three mountains under coerced fixed percentage agreement). But we do not have the same situation here.

The flat fee, in itself, is not offensive to the antitrust laws. It is clear that independent entities separately capable of output of products or services may combine to market the output for a flat fee if the combination accomplishes an efficiency-producing integration of functions and if

price effects are ancillary to the integration. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 357, 102 S.Ct. 2466, 2479, 73 L.Ed.2d 48 (1982) (if, for example, "a clinic offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price-fixing agreement among the doctors would be perfectly proper").

CFA maintains, with probative support, that the challenged arrangements place a price only on the package plans offered and not on other television rights that may be sold by CFA members. Moreover, CFA argues, CFA could not artificially raise prices without a controlling response from the current market in which telecasters can turn to other competitive packages.

■ INTV and SVC have not demonstrated that the prices of the CFA or Big Eight packages exceed prices for comparable programming, nor have they proved that the package plans raise the price of rights to games not selected for the package. Nor have INTV and SVC demonstrated beyond dispute that teams competing as part of the package would be compensated differently if rights to these games were negotiated separately. In contrast to this sparsity of evidence, the defendants assert that the package pricing is competitive with similar plans, that the package pricing does not interfere with separate negotiations by CFA and Big Eight members, and that the package pricing cannot lead but is rather disciplined by the larger market. These contrary statements of fact preclude summary judgment on the issue of whether the defendants agreements constitute illegal price fixing.

## 2. OUTPUT RESTRICTIONS

INTV and SVC object to various restrictions on output which they allege inevitably result from the "exclusivity" granted to ABC, ESPN, and Katz. Specifically, INTV and SVC oppose the provisions of the agreements that limit head-to-head competition by requiring competing games to be televised at times other than the package offerings and that permit the networks to make the package selection as late as 12 days before game day.

■ The court notes at the outset that the marketing of exclusive rights is not in itself offensive to the antitrust laws. Nor can it be disputed that marketing of exclusive rights to television programs is not in itself violative of the antitrust laws. Exclusive licenses in the television industry have commonly been found to advance competition by providing incentives to telecasters to invest in promotion and development of programs. Without exclusivity it is doubtful that many licensees could afford to develop programs fully.

Exclusivity therefore holds the potential to increase the number of available programs and simultaneously minimizes fragmentation of the audience for each offering. It can also increase the value of the exclusively-licensed program by avoiding overexposure of it and thereby extending its useful life. Exclusivity also enhances the uniqueness of the purchaser's identity and of its identification with the program. It facilitates program planning by establishing that the licensed purchaser may air the program without fear that the same program will be aired by a competitor at the same time.[13]

■ But INTV and SVC maintain that the exclusivity enjoyed by ABC, ESPN, and

---

13. *See Naumkeag Theatres Co. v. New England Theatres, Inc.*, 345 F.2d 910, 912 (1st Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965) (exclusive rights to motion picture exhibitor to show film commercially justifiable as reaching largest number of viewers with smallest number of prints and enabling first-run theatres to charge premium prices and to receive benefit of word-of-mouth advertising); *Sandura Co. v. FTC*, 339 F.2d 847, 852–53 (6th Cir.1964) (vertical agreement to create closed geographical areas for distribution of floor cov-

erings justified by need to promote sales and fact that distributors will not advertise without exclusive rights to product); *Ralph C. Wilson Industries, Inc. v. American Broadcasting Companies, Inc.*, 598 F.Supp. 694, 706 (N.D.Cal.1984) (vertical exclusive rights agreements with distributor of television programs permits licensee to fully invest in development and promotion of programs); *see generally* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6 (1981).

Katz has the purpose and effect of constraining production of the televised product with the inevitable consequence of artificial price inflation. If true, such arrangements would be illegal. However, the alleged anticompetitive effects of each of the challenged provisions are contested by each of the defendants. Such material factual disputes prevent any summary determination that the arrangements in fact restrict output.

There are sharp factual disagreements about the effects of provisions restricting CFA and Big Eight teams from televising games in simultaneous competition with the package offerings. The CFA plan is not as restrictive as the NCAA plan with respect to exception telecasts. Based upon the facts found by this court in *Board of Regents*, the Court of Appeals concluded that exception telecasts were only a "minor deviation" from the exclusive rights of the networks under the NCAA plan and that exception telecasts "occur infrequently and do not affect our analysis of the television plan and network contracts." 707 F.2d 1147, 1150 n. 2 (10th Cir.1983). In contrast, the CFA plan has an open early afternoon window during which CFA members may sell telecast rights unfettered by the CFA plan. INTV and SVC assert, however, that by requiring member clubs to move games from the Saturday afternoon schedule to avoid direct competition with the network selections, the CFA plan has reduced output. Since many CFA members are unwilling to reschedule their games, INTV members and SVC were denied telecasts of games for which they had contracted. The defendants contest this contention and deny that the plaintiffs have proved that *more* rather than different games would be shown. CFA also challenges INTV's contentions about the nature and extent of the time-period exclusivity granted. CFA asserts that during 1984, CFA games in the open period overlapped with games during the protected period and that institutions that are not members of CFA, including 31 of NCAA's Division IA members, could and did compete with the protected CFA–ABC afternoon period. During 1985, CFA alleges, games in the open period overlapped with the protected period to a greater extent than in 1984, all restrictions on pay-per-view and crossover telecasts [14] were eliminated, access telecasts in the home markets of competing institutions were unlimited, and no ABC doubleheaders covering both afternoon time periods were to be scheduled. Even with the limited exclusivity of the 1984 and 1985 plans, CFA argues, viewers still were presented with late afternoon choices. During both seasons, it asserts, at least one college game was televised in head-to-head competition with the game selected by ABC. In light of these contrary factual allegations, the court cannot summarily judge the anticompetitive effects of the kickoff time restrictions imposed by the CFA and Big Eight plans.[15]

14. A "crossover" game is a game in which a CFA member competes with a non-member institution or a Big Eight member competes with an institution outside its own conference. It is undisputed that under the 1984 agreements, a CFA member could not contract for national network television rights to its games with non-members, or even if the game was "passed" by ABC and ESPN. It was this very restriction that was before the court in *Regents of the University of California v. American Broadcasting Companies, Inc.*, 747 F.2d 511 (9th Cir.1984), in which a game between Notre Dame, a CFA member, and USC, a Big 10–PAC 10 member, was, before an injunction was entered, threatened with blackout by the ban on national telecasts of crossover games in conflict with the CFA plan.

15. The court notes the striking similarities between the time period exclusivity provisions of the 1984 CFA television plan and the parallel terms of the proposed 1986 USFL television plan approved by the Department of Justice. Under the USFL plan, the league proposes to make a pool of one to four Saturday afternoon games available to its contracting television network. The network could select one game for national telecast or could show two or more games regionally.

The network would have exclusive rights to the Saturday afternoon games, and games not selected could not be televised by the competing clubs. All other USFL games would be played on Saturday nights outside the exclusive window or on other days of the week. Each USFL team would retain and could assign telecast rights to its games within its home market except during the exclusive Saturday afternoon window. The proposed agreement would be in addition to an agreement between USFL and

INTV and SVC also object to the networks' right of first refusal of the telecast rights to all CFA games until 12 days prior to the date of telecast. CFA charges that INTV and SVC seek to force the networks to exercise their options before the season starts. In this way, INTV and SVC will have rights to cinderella teams with unexpected national rankings late in the season, depriving the networks and the national audience of these games of interest; CFA maintains that INTV thus proposes an anticompetitive market arrangement in which viewer choice is disregarded.

In prior years, according to CFA, networks have not been required to select their games until five days before telecast. The 12-day requirement was imposed on the networks for the benefit of syndicators and competing institutions and was intended to notify them of games available for telecast outside the package. CFA claims that the 12-day lead time strikes the appropriate balance between the wishes of independent telecasters who would like more time, and the demands of the networks who would like to return to a five-day deadline. The 12-day accommodation, says CFA, insures the networks consistent access to games of intense interest without impairing the arrangements for and promotion of regional and local telecasts. The 1984 experience, according to CFA, demonstrated the workability of the 12-day lead requirement which it says will remain in place with some exceptions not described. The effects of the 12-day period are thus also contested.

The court therefore cannot summarily discern whether the challenged agreements work output restrictions or, if so, if the restrictions are justifiable and ultimately pro-competitive. The purposes, necessity, and effects of both the time-period exclusivity and the 12-day selection deadline are hotly disputed. Until the true facts are established, INTV and SVC are not entitled to judgment as a matter of law.

### 3. MARKET DIVISION

■ Division of markets by competitors is illegal. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). INTV and SVC assert that the agreements limiting the exposure of each member institution and restricting the geographical scope of access and pay-per-view exception telecasts are market divisions condemned by the antitrust laws. INTV and SVC contend that these apportionments are naked restraints with no purpose except to stifle competition.

The defendants maintain that the agreements not to compete with the package offerings are necessary in order to attract a network purchaser that will invest in, lavishly produce, and vigorously promote the package. The Supreme Court has recognized that joint venturers are not required individually to compete with the product jointly produced. *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 168–69, 84 S.Ct. 1710, 1715–16, 12 L.Ed.2d 775 (1964) (participants in joint venture not required to "compete with their progeny"); *see Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979).

■ Evaluation of these provisions thus requires evaluation of the entire set of

ESPN for evening cablecasts and a possible third agreement effectuating a network television plan for Sunday afternoons. The Department of Justice specifically considered the exclusivity clause and concluded that "the USFL's proposed agreement, including the window of exclusivity, appears at the present time and under present market conditions to be reasonably necessary in order for the USFL to have a chance of surviving in competition with the NFL and thus providing additional competition in the market in which broadcast rights for professional football are sold, and other markets as well." The government assumed when issuing its business review letter that the USFL would not survive without such a television plan. No such contention is made with respect to CFA or the Big Eight. The business review letter nonetheless underlines the importance of considering the purpose and effect of such restraints in the market in which they appear. Such consideration requires resolution of the many factual disputes that have been presented by these motions.

arrangements to determine whether its purpose and effect are to make possible the production and distribution of otherwise unavailable products, or whether the intent and consequence of the plans are to stifle competition.

## IV. MONOPOLIZATION

■ INTV's and SVC's claims of monopoly and conspiracy and attempt to monopolize also present material factual issues. There are two elements to the offense of monopolization: possession of market power in the relevant market and the intentional acquisition or maintenance of the power, as distinguished from the growth and development of market influence as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1519 n. 12 (10th Cir.1984), *aff'd,* —— U.S. ——, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In order to establish monopolization, INTV and SVC thus must prove that the defendants have monopoly power in a relevant market; that is, the power to control price and prevent entry to the market. *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956); *see* ABA Antitrust Section, *Antitrust Law Developments* 110 (2d ed. 1984).

### A. MONOPOLY POWER

■ Market share is the great yardstick of monopoly power. Absent proof of market share, there ordinarily can be no reasonably accurate inference of power. *See Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 439 (10th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983). The factual disputes concerning market definition have already been discussed. But even assuming that INTV's and SVC's alleged product market—live college football television—is the relevant one, factual disputes remain over the defendants' power in it.

■ Having argued that the relevant product market is live college football tele-

vision, INTV and SVC curiously then assert that CFA's monopoly power should be judged by reference to a product market that includes only CFA, Big 10 and PAC 10 games. Since CFA has 63 members, these 63 institutions constitute approximately 75 percent of the relevant market of 83 competing institutions.

INTV's summary elimination of all other college football from the relevant product market is unexplained. INTV and SVC also take no account of the market share commanded by CFA's own members marketing telecast rights outside the CFA and Big Eight plans. Because each of the member institutions is free to sell television rights to its games, CFA argues that the market power of CFA cannot be inferred from mere reference to the number and quality of its members. Unlike NCAA members under the NCAA plan, CFA members individually may enter the marketplace along with CFA.

Finally, the court notes that INTV accuses the Big 10–PAC 10 collaboration with monopolization of the same geographical and product markets as INTV alleges in these actions. Certainly, two or more entities may combine to establish monopoly power—a shared monopoly—in the same market; but there is no allegation of concerted action by CFA and the Big 10–PAC 10 collaboration. Moreover, control of less than half of a market may prove absence of monopoly power. INTV and SVC have not shown the defendants' monopoly power beyond genuine factual dispute.

### B. CONSPIRACY

■ In order to prove their claim of conspiracy to monopolize, INTV and SVC must prove the existence of a combination or conspiracy; overt acts done in furtherance of the combination or conspiracy; an effect upon an appreciable amount of interstate commerce; and a specific intent to monopolize. *See Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 438 (10th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983); *Olson Farms, Inc. v. Safeway Stores, Inc.*, 649 F.2d 1370,

1374 n. 3, 1380 n. 8 (10th Cir.1979) (Holloway, C.J., concurring in part and dissenting in part) (defendant liable as conspirator only upon finding of specific intent). CFA disputes the existence of any conspiracy and denies any intent to monopolize the alleged market. There is thus a genuine factual dispute about the defendants' intents and purposes in fashioning and performing the 1984 agreements.

CFA asserts that the United States Supreme Court's opinion in *Board of Regents* threw the college football television industry into a tumult in which inexperience with market forces, haste, fear of change from the familiar to the unknown, and uncertainty about controlling law were initially factors. CFA asserts that under such circumstances its member institutions have done a "remarkable" job of increasing the quantity, quality, and variety of televised games, increasing viewership, and distributing more widely the greater revenues that have resulted.

CFA characterizes the challenged arrangements as evidence of an emerging "tier system" that is the natural result of free competition to find efficiencies in the marketing of college football for television. CFA likens the new market to professional sports and college basketball in which national networks lay first claim to games of intense national interest; games of regional significance are then selected by syndicators of individual football conferences or regions; and remaining games of principally local interest are then selected for local broadcast or cable presentation. CFA contends that this system is a pure creation of a competitive marketplace and that it best accommodates the needs of the competing colleges and universities, the commercial aspirations of the television industry, and the choice of viewers of college football.

CFA asserts that evolution in the CFA arrangements moves toward greater regional and local access to television rights. The defendants contend that the elimination in 1985 and 1986 of the morning kickoff (no game need start before 12:05 p.m. local time), unlimited local evening telecasts, and unrestricted afternoon and evening pay-per-view telecasts, all relax the restrictions of which INTV and SVC complain.

INTV and SVC offer many quotations allegedly evincing anticompetitive intent by persons associated with the defendants or with their members. For several reasons, the court is not persuaded that these references to restrictions upon free market forces constitute proof beyond reasonable factual dispute of a conspiracy by the defendants. Statements of personal views sometimes are assigned to the defendants. Many of the statements are taken from contexts that permit competing inferences. Many of the actions said to show monolithic anticompetitive intent occurred prior to the Supreme Court decision in *Board of Regents* or even before that suit was filed, and thus were taken without the benefit of the guidelines there established. CFA characterizes INTV's and SVC's myriad quotations as "misleading bits and pieces" of statements, "never quoted in full" and "always taken out of context," intended to create an "unfounded and distorted picture" of the major football-playing institutions.

All of the defendants deny any intention to monopolize. Inquiry into the intent of those accused of concerted and purposeful attempts to suppress competition, as the Supreme Court pointed out in *Poller*, is exceedingly difficult at the pretrial stages of these matters. The court cannot beyond reasonable factual dispute weight the contentions of the parties, determine their credibility, and summarily decide their commercial purposes and private motives as a matter of law.

### C. ATTEMPT

■ There are also factual disputes concerning the elements of attempts to monopolize. INTV and SVC must show four elements in order to prove such an attempt in violation of the antitrust laws: a relevant market; a dangerous probability of success; acts in furtherance of the attempt; and a specific intent to monopolize. *See Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1521 n.

16 (10th Cir.1984), *aff'd*, — U.S. —, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 436–37 (10th Cir.), *cert. denied*, 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983); *Olson Farms, Inc. v. Safeway Stores, Inc.*, 649 F.2d 1370, 1380 n. 3 (10th Cir.1979) (Holloway, C.J., concurring in part and dissenting in part); *E.J. Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 306 (10th Cir.1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976); *but see Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) ("the relevant market is 'not in issue' in an attempt or conspiracy to monopolize case"). CFA and the Big Eight dispute the relevant product market, deny any market power, deny any probability of success, and deny specific intent to monopolize.

In *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.*, 783 F.2d 159 (10th Cir. 1986), the Court of Appeals established in this circuit the requirement that the antitrust plaintiff alleging a dangerous probability of successful monopolization must establish *both* that his adversary can acquire the power to control price in a relevant market *and* that the would-be monopolist can gain the ability to exclude competitors from the same market. Moreover, no dangerous probability of success exists merely because the defendants have market power; they must have "market strength that approaches monopoly power." *Id.*, at 163. The court has already discussed the factual disputes that pervade the parties' discussion of the defendants' market power. These disputes are only intensified as a showing of greater power is required. "At the very least it must be shown how much of the relevant market a defendant controls if market power is to be evaluated." *Id.*, at 162. INTV and SVC have not yet established the defendants' share of a relevant market.

■ The court concludes that there are genuine factual differences about whether there is a dangerous probability that CFA and the Big Eight can or will be able to control prices and exclude competition in a relevant market. INTV's and SVC's claims

of attempted monopolization cannot be adjudged summarily.

For the foregoing reasons, the court concludes that these cases present genuine issues of material fact and that the plaintiffs Association of Independent Television Stations, Inc. and Sports View Company are not entitled to judgment as a matter of law. Accordingly, their motions for summary judgment and partial summary judgment are denied.